**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| *ex rel*. COLLEEN BATTY, the STATE OF ) | |
| ILLINOIS, *ex rel.* COLLEEN BATTY, and ) | |
| COLLEEN BATTY, individually, ) | |
| ) | Judge Ruben Castillo |
| Plaintiffs, ) | Magistrate Judge Brown |
| ) | |
| v. ) | Case No.  05 C 1416 |
| AMERIGROUP ILLINOIS, INC., an Illinois ) | |
| corporation, and AMERIGROUP ) | |
| CORPORATION, a Delaware corporation, ) | Jury Trial Demanded |
| ) | |
| Defendants. ) | |
| ) | |

## FIRST AMENDED COMPLAINT

COME NOW the Plaintiffs, the United States of America and the State of Illinois,

by the Relator, Colleen Batty, by and through her counsel, and for their First Amended

Complaint against Defendants Amerigroup Illinois, Inc. and Amerigroup Corporation,

allege as follows:

## I. PARTIES, JURISDICTION AND VENUE

1.      Relator Colleen Batty is a citizen of the United States and, at all times

relevant hereto, a resident of Glen Ellyn, Du Page County, Illinois.  On July 8, 2002,

Relator began employment with Defendant Amerigroup Illinois, Inc. as Associate Vice

President of Provider Relations.  Relator continued in this employment until her

termination on September 28, 2004.

2.      Relator brings this action for damages and civil penalties on behalf of

Plaintiff the United States of America arising from false statements and records made or

caused to be made by Defendants to the United States in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

3.      Relator brings this action for damages and civil penalties on behalf of Plaintiff the State of Illinois arising from false statements and records made or caused to be made by Defendants to the State of Illinois in violation of the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*

4.      Plaintiff Colleen Batty brings this action on behalf of herself for wrongful employment actions and discharge in violation of the False Claims Act, 31 U.S.C. § 3730(h), and the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/4(g).

5.      At all times relevant, Defendant Amerigroup Illinois, Inc. (hereafter "Amerigroup Illinois") was an Illinois corporation with its principal place of business located at 211 W. Wacker Drive, Suite 1350, Chicago, Illinois.  Amerigroup Illinois operated a health maintenance organization ("HMO") in Illinois until July 31, 2006 pursuant to a Certificate of Authority issued by the State of Illinois Department of Insurance and the State of Illinois Department of Health.

6.      Defendant Amerigroup Corporation (hereafter "Amerigroup Corporation") is a Delaware corporation with its principal offices located at 4425 Corporation Lane, Virginia Beach, Virginia.  Amerigroup Corporation is a managed care health insurance company which provides administration of healthcare benefits to recipients of Medicaid and other state operated medical programs.  It currently operates managed care plans in the District of Columbia, Florida, Maryland, New Jersey, Texas, and New York.

7.      This Court has subject matter jurisdiction over Claims for Relief One, Two, Three, Four and Nine pursuant to 28 U.S.C. § 1331.

8.      This Court has subject matter jurisdiction over Claims for Relief Five, Six, Seven, Eight, and Ten pursuant to 28 U.S.C. §§ 1367 and 31 U.S.C. § 3732(b) because these claims for relief arise from the same transactions or occurrences as Claims for Relief One, Two Three, Four, and Nine and are so related to Claims for Relief One, Two, Three, Four, and Nine that they form part of the same case or controversy under Article III of the United States Constitution.

9.      None of the allegations set forth in this First Amended Complaint are based upon a public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or General Accounting office report, hearing, audit, or investigation, or from the news media.

10.      Relator has direct and independent knowledge, within the meaning of 31 U.S.C. § 3730(e)(4)(B), of the information on which the allegations set forth in this First Amended Complaint are based.

11.      To the extent, if any, that this action is deemed to be a related action and that facts set forth herein are deemed to be the same as facts underlying an existing *qui tam* False Claims Act action pending at the time of filing of this action, all such factual allegations in common with either pending action which would cause this to be a related action are hereby expressly excluded from this action to the extent necessary to prevent this action from being a related action.

12.      To the extent that the allegations or transactions set forth in this First Amended Complaint are based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States is already a party, if any such proceeding exists, then the allegations or transactions

referred to herein that the Court deems are based upon allegations or transactions which are the subject of any such civil suit or administrative civil money penalty proceeding are expressly excluded herefrom, but only for the specific time periods, specific companies, and specific allegations or transactions as necessary.

13.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. § 1391(b) and (c), because at the time this action was commenced Defendant Amerigroup Illinois could be found in, resided in and transacted business in this judicial district, and because the acts alleged herein to be in violation of 31 U.S.C. § 3729 occurred in this judicial district.

## II. THE STATUTORY AND REGULATORY SCHEME GOVERNING THE DEFENDANTS' CONDUCT

14.     Medicaid is a Federal and State general assistance program that provides medical benefits to low-income and other categorically needy individuals.

15.     At the Federal level, the United States Centers for Medicare and Medicaid Services ("CMS") administers the Medicaid program.

16.     Within a broad legal framework, each State designs and administers its own Medicaid program.  Each State prepares a plan that defines how the State will operate its Medicaid program and is required to submit the plan for CMS approval.

17.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program, in accordance with Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*  The Federal Government grants funds to the individual states for Medical Assistance Programs to furnish medical assistance to families with dependent children and to aged, blind, or disabled individuals whose income and resources are insufficient to meet the costs of necessary medical

services. The benefits paid by the individual state agencies contain a certain percentage of federal funds. *Id.*

18.    CMS allows states to administer Medicaid benefits through fee-for-service programs, in which the State pays claims based upon a fee schedule established by the State, or through managed care plans, in which private insurance companies contract with the State to provide medical benefits to Medicaid recipients in exchange for a set monthly per member premium.

19.    Under the fee-for-service program, the Medicaid beneficiary has the right to receive medical treatment from any physician of his or her choosing who participates in the particular State's Medicaid program.  Under the managed care programs, Medicaid beneficiaries are required to use a network of certain providers who have agreed to accept a payment lower than the normal customary Medicaid payment rate in exchange for referrals of the Medicaid beneficiaries to their facilities for treatment.

20.    A managed care organization ("MCO") contracting with a State to administer Medicaid benefits must comply with all rules and regulations governing the Medicaid program in order to receive payment under the Medicaid managed care program.  42 CFR §438.602.  Failure to comply with all rules and regulations governing the Medicaid program can result in termination of the MCO's contract.  42 CFR §438.708.

21.    Illinois was approved by CMS for the operation of a Medicaid program for its indigent and other needy individuals.  Since 1998, the percentage of federal funds involved in the Illinois Medicaid program has been as follows:  1998, 1999, 2000, 2001, 2002, and the 1st and 2nd Quarters of 2003 - 50%;  3rd and 4th Quarters of 2003 - 52.95%;

first three Quarters of 2004 - 52.95%;  4th Quarter of 2004 and 2005 - 50%; 2006 - 50%.

The federal government pays Illinois for a certain portion of the Medicaid program

through quarterly grants.

22.     The Illinois Department of Public Aid, now known as the Illinois

Department of Healthcare and Family Services (HFS), is responsible for administering

Medicaid in Illinois.  Medicaid beneficiaries in Illinois have the option of receiving

Medicaid benefits through either a fee-for-service program or a managed care

organization (an "MCO").

23.     Claims for reimbursement of medical services under Illinois Medicaid are

to be paid in accordance with the Illinois Public Aid Code and Rules and Regulations

promulgated by HFS, which are distributed to providers and periodically updated.

24.     Illinois is a "voluntary" managed care state, meaning HFS does not have

mandatory enrollment in Medicaid managed care for Medicaid beneficiaries, but rather

allows Medicaid beneficiaries to choose whether to participate in such a program in areas

where it is offered.  Illinois offers managed care programs only in Cook, Franklin,

Jackson, Madison, Perry, Randolph, St. Clair, Washington, and Williamson Counties

through MCO contracts with five different insurance companies.  As of January, 2005,

174,813 Illinois Medicaid recipients were enrolled in an MCO program.

25.     Under a fee-for-service program, HFS directly pays the physicians who

treat patients.  Under a managed care organization, HFS pays an MCO a fixed monthly

payment for each individual enrolled in the program.  These payments are called

capitation payments.

26.     To receive federal Medicaid grants, Illinois submits a quarterly estimate to the United States for estimated costs, including an estimate for MCO services.  The quarterly estimate is submitted on a Form CMS 37, which includes a certification that "budget estimates only include expenditures . . . that are allowable in accordance with the applicable federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary and in effect during the fiscal year under Title XIX of the Act for the Medicaid Program."

27.     The Unites States uses the estimate in the CMS 37 to make grant awards for that quarter.  The award authorizes the state to draw federal funds as needed through a line of credit.

28.     At the end of each quarter, HFS submits its quarterly expenditure report, Form CMS 64, which details HFS' actual expenditures.  The capitation payments to MCO's are included in Form CMS 64, which includes the same certification as CMS 37.

29.     Illinois MCOs are required to reimburse medical claims in accordance with their contracts, the Illinois Public Aid Code, the Illinois Administrative Code, the rules and regulations promulgated by HFS and all federal regulations governing Medicaid.

30.     Federal Medicaid regulations provide that an MCOs is responsible for coverage and payment of emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether the MCO has a contract with the treating hospital.  42 CFR 438.114(b) and (c); 42 CFR 422.113(c).

31.     Hospital emergency room services are covered medical services under Illinois Medicaid. See Section 103.1, IDPA Handbook for Providers of Medical

Services.  Exhibit A. Emergency services are defined by 89 Ill.Adm.Code

148.140(b)(1)(C) as:

> Services that are for a medical condition manifesting itself
> by acute symptoms of sufficient severity (including severe
> pain) such that a prudent layperson, possessing average
> knowledge of medicine and health, could reasonably expect
> that the absence of immediate attention would result in
> placing the health of the individual (or, with respect to a
> pregnant woman, the health of the woman or her unborn
> child) in serious jeopardy, serious impairment to bodily
> functions or serious dysfunction of any bodily organ or
> part.

32.     HFS recognizes three levels of emergency services, as set forth at 89

Ill.Adm.Code 148.140(b)(1)(C), each with a different level of reimbursement:

a.   Level 1 – Emergency services provided for the alleviation of

severe pain or for the immediate diagnosis and/or treatment of

conditions or injuries that post an immediate significant threat to

life or physiologic function or requires more than two hours of

documented one-on-one nursing care or treatment.  Payment level

= $172.00.

b.   Level 2 – Emergency services that do not qualify as Level 1 but

are provided in a hospital emergency department for severe, acute

symptoms of a medical condition.  Payment level = $64.00.

c.   Non-Emergency/Screening Level – Services provided in a hospital

emergency room that do not qualify as Level 1 or 2.  Payment

level = screening fee of $25.00 or current rates for the services

provided.[1]

33.    Reimbursement for such services under the Illinois fee-for-service

program is to be made at the lower of the hospital's usual and customary charges to the

public or HFS's maximum reimbursement rate.  89 Ill.Adm.Code 148.140(a)(2).

34.    MCOs may not limit the level of coverage paid for emergency services

on the basis of diagnosis or symptoms.  42 CFR 438.114(d)(1)(i).  Instead, the level of

coverage paid "shall be based upon the circumstances at the time of the initial

examination, not upon the final determination of the client's actual condition, unless the

actual condition is more severe."  89 Ill.Adm.Code 148.140.

## III. THE CONTRACTUAL OBLIGATIONS GOVERNING THE DEFENDANTS' CONDUCT

35.    From 1996 through 2005, Amerigroup Illinois entered into managed care

contracts with HFS to provide health services through an MCO for Illinois Medicaid

recipients.

36.    On March 30, 2000, Amerigroup Illinois entered into its last Contract for

Furnishing Health Services by a Health Maintenance Organization ("Contract") with HFS

to provide managed care services to Illinois Medicaid recipients in Cook County, Illinois

area choosing to participate in managed care.  A copy of said Contract, with amendments,

is attached hereto and incorporated herein as Exhibit B.  The Contract terminated July 31,

2006.

---

[1] The rates listed are as of November 24, 2004, the effective date of the most current version of 89 Ill.Adm.Code 148.140 at the time this action was commenced.  The rates have varied based upon the applicable Medicaid Fee Schedule.

37.     The Contract required that Amerigroup Illinois perform all services and duties set forth in its Contract in accordance with the Administrative Rules, HFS published materials, and any other rules and regulations that were issued during the contract term; comply with all state and federal laws and regulations and all regulations promulgated by the Illinois Department of Insurance, Illinois Department of Public Health, and CMS; and perform in compliance with all applicable federal and State laws Exhibit B, § 2.3, § 2.7, and § 9.13.  The Contract also required Amerigroup Illinois to make payments to providers for Covered Services on a timely basis.  Exhibit B, § 5.15.

38.     Pursuant to the Contract, Amerigroup Illinois enrolled members through marketing representatives.  The marketing representatives found potential enrollees and initiated enrollment by submitting managed care enrollment forms to HFS.

39.     HFS processed the forms, determined the prospective member's eligibility and then, if eligible, enrolled the member.

40.     HFS paid Amerigroup Illinois the applicable capitation rate for each enrollee.  Under the terms of the Contract, HFS made monthly payments to Amerigroup Illinois based on its enrollees.  The rates, determined by HFS, were based on, among other things:

    a.  Amerigroup Illinois' agreement to properly pay for emergency services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

    b.  Amerigroup Illinois' agreement to properly pay for post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

41.     Pursuant to § 5.11(a)(6) of the Contract, Defendants were to submit a quarterly fraud and abuse certification reporting "all allegations of Fraud, Abuse or Misconduct of Providers, Beneficiaries or Department Employees . . ."

## IV. THE RELATIONSHIP BETWEEN AMERIGROUP ILLINOIS AND AMERIGROUP CORPORATION

42.     Amerigroup Illinois is a wholly owned subsidiary of Amerigroup Corporation.  The primary plan functions housed at Amerigroup Illinois' Chicago headquarters were marketing and provider relations.

43.     Amerigroup Corporation centralizes claims processing for all its subsidiary companies at its corporate headquarters in Virginia Beach, Virginia.   Claims submitted to Amerigroup Illinois are paid by Amerigroup Corporation through this centralized claims processing unit.

44.     Amerigroup Corporation also provides centralized customer service and payment dispute resolution services for all its subsidiary companies at its corporate headquarters in Virginia Beach, Virginia.

45.     HFS, Amerigroup Illinois and Amerigroup Corporation held quarterly meetings to review Amerigroup Illinois' operations and performance under its contracts. Amerigroup Corporation employees participated in each quarterly meeting among HFS, Amerigroup Illinois, and Amerigroup Corporation.  Amerigroup Illinois personnel attending these meetings have included:   Relator; Jean Moise, Chief Operating Officer; Prentiss Taylor, Medical Director; Ron Austin, Director of Medical Management; Susan Gilmore, Director of Quality Assurance; Therese Adams, Former Director of Quality Management; and Jane Goldsmith, Director of Quality Management.  Amerigroup Corporation personnel attending the meetings were Debbie Gorden, Director of

Regulatory Compliance for Amerigroup Corporation, and Robin Germain, of Information Technology for Amerigroup Corporation.

46.     At all times relevant, Amerigroup Corporation was aware of, authorized, ratified and participated in the False Claims alleged in this First Amended Complaint.

**V. THE DEFENDANTS' ROUTINE MAKING OF FALSE CLAIMS IN CONNECTION WITH THEIR STATUTORY, REGULATORY, AND CONTRACTUAL OBLIGATIONS**

47.     Amerigroup Illinois' Chief Operating Officer Jean Moise hired Relator in July 2002 to serve as Associate Vice President of Provider Relations.  As Associate Vice President of Provider Relations, Relator oversaw and personally engaged in enrolling providers in Amerigroup Illinois' managed care network and the handling of provider appeals, inquiries, and complaints.

48.     In her capacity as Associate Vice President of Provider Relations for Amerigroup Illinois, Relator gained direct and independent knowledge of the allegations set forth in this First Amended Complaint.

**A. THE DEFENDANTS VIOLATED THE FALSE CLAIMS ACT IN CONNECTION WITH EMERGENCY AND POST STABILIZATION CLAIMS MADE BY OUT-OF-NETWORK FACILITIES**

49.     When Relator began working at Amerigroup Illinois on July 8, 2002, Amerigroup Illinois had eighteen hospitals within its provider network.  Relator was instructed by her immediate supervisor, Moise, that Amerigroup Illinois wanted to significantly increase its membership and that Relator was expected to expand the provider network accordingly.

50.     In Relator's efforts to enroll more providers in Amerigroup Illinois' network, various out-of-network hospitals brought issues regarding Amerigroup Illinois'

failure to properly pay emergency and post-stabilization claims to Relator's attention. These out-of-network hospitals included, but were not limited to, the following:  Ingalls Memorial Hospital (Medicare Provider No. 104191), Children's Memorial Hospital (Medicare Provider No. 143300), Loretto Hospital (Medicare Provider No. 140083), West Suburban Hospital (Medicare Provider No. 140049), University of Chicago Hospital (Medicare Provider No. 140088), and St. James Hospital (Medicare Provider No. 140079).

51.     As a general rule, MCOs are liable only for claims resulting from treatment by a network provider unless specifically required by either their contract or Medicaid laws and regulations to cover such services.

52.     Federal law and regulations, Illinois law and regulations, and the Contract obligated Amerigroup Illinois to cover and pay claims for emergency services and post-stabilization services regardless of whether the provider that furnished the services had a contract with the Amerigroup Illinois.  42 CFR 438.108(b), Exhibit B, §§ 5.1(h)(1) and 5.1(i)(1).  Specifically, Amerigroup Illinois' Contract required that it pay emergency room and post-stabilization services provided at out-of-network hospitals at the same rate HFS would pay for such services on a fee-for-service basis.  Exhibit B, §§ 5.15 and 5.1(h)(5).

53.     When a hospital bills for emergency room services for an Illinois Medicaid recipient, the billing code utilized indicates one of the three levels of service outlined in 89 Ill.Adm.Code 148.140(b)(1)(C), i.e., Level 1, Level 2, and Non Emergency/Screening Level.  When Relator looked closely at Amerigroup Corporation's configured payment structure and rates for these three levels of payment at out-of-

network hospitals, she discovered that the rates Amerigroup Corporation was paying for Amerigroup Illinois' were in some instances less than amounts set by HFS for fee-for-service recipients.

54.     Relator's research into Amerigroup Corporation's processing of out-of-network emergency room claims revealed that while Amerigroup Illinois did have three payment levels in place for emergency room services, some of the rates being paid were systematically lower than the HFS rates specified for fee-for-service beneficiaries. Relator also determined that Amerigroup Corporation did not approve or pay separate physician charges arising from the emergency room visits.

55.     After reporting her findings to upper level Amerigroup Corporation, Ron Austin, Director of Medical Management, requested that Relator work to resolve the problem with the Amerigroup Illinois emergency room claims.

56.     Relator went to Leonard Van Slyke, who had been in the Provider Relations Department at Amerigroup Illinois for three years, and questioned Van Slyke as to his understanding of Amerigroup Illinois' payment of emergency room claims. In response to that question, Van Slyke provided Relator with a June 12, 2000 e-mail he had received from Jeanne Hollis, former Amerigroup Illinois' Director of Medical Management.  The e-mail stated that Hollis had obtained payment data from the State and a decision had "finally" been made regarding how emergency room assessment screening should be paid. A copy of that e-mail is attached hereto as Exhibit C.  This e-mail states that Hollis had obtained information from HFS about the payment of emergency assessment screening claims and requested that the claims payment system be configured to (a) pay non-participating facilities at a rate of $35 for assessment screenings, (b) pay participating facilities at the contracting rate,

(c) pay $35 to any participating or non-participating emergency room physician filing a separate claim for services, (d) pay any emergency room visit not meeting emergency room criteria as an emergency assessment, and (e) not pay separate claims for radiology or lab services associated with the treatment. See Exhibit C.

57.     Van Slyke also provided Relator a January, 2001 e-mail strain originating with Relator's predecessor at Amerigroup, Illinois Angelia Graham, on January 26, 2001.  The e-mail states that providers were resubmitting claims for previously denied emergency room charges which were not paid because the services were rendered prior to the August 1, 2000, the effective date of the policy to pay a $35 assessment fee. A copy of this e-mail is attached hereto as Exhibit D.  Graham states in her e-mail that she believes Amerigroup Illinois is required by law to pay an assessment fee on claims not meeting medical necessity criteria regardless of whether the claim occurred prior to August 1, 2000. Graham also notes that a policy to pay the assessment fee on appeal was created when the medical necessity criteria was established. See Exhibit D. Bobbie Jo Jonas, the Amerigroup Corporation Regulatory Compliance Associate assigned to the Amerigroup Illinois contract, responded that the Balanced Budget Act was effective in 1997 so "technically providers would have ground to argue that we are responsible for ER screenings and services back to 1997."  Exhibit D.

58.     Based upon these e-mails, Relator began researching the problem with payment of emergency room claims with the assumption that Amerigroup Corporation's claim system had been configured in accordance with these e-mails to appropriately pay emergency room claims. Relator ultimately discovered, however, that the system had never been configured to pay the emergency room claims at correct rates.

59.     In addition to complaints lodged with Amerigroup Illinois regarding the lack of payment, providers also complained to HFS regarding the payment deficiencies. HFS passed these complaints on to Amerigroup Illinois.

60.     The emergency room claim payment problem was partially resolved by Amerigroup Illinois in February 2003.  During the resolution process, Amerigroup Corporation's Medical Finance Team evaluated the possibility of a retroactive reimbursement to providers inappropriately paid for emergency room services. The team determined that it would cost Defendant Amerigroup Illinois over a million dollars to retroactively pay the claims for a two year period and approximately $300,000 to prospectively pay claims from the beginning of 2003.

61.     Amerigroup Corporation chose to correct the problem only prospectively. Moise confirmed this choice with Amerigroup Corporation on January 14, 2003.  A copy of the confirmation is attached hereto as Exhibit E.

62.     Relator also determined that Amerigroup Corporation was unable to process post-stabilization claims appropriately because its claim processing system could not tie the emergency room claim to the in-patient claim.  The claims system was not configured to recognize that an inpatient claim without an authorization is tied to the emergency room claim and should be paid as a post-stabilization claim. Consequently, Amerigroup Corporation's claims processing system saw the claim as an inpatient claim without authorization and denied the claim.

63.     In October, 2003, Amerigroup Corporation's Medical Finance Department determined that correction of the post-stabilization claims issue would result in a cost increase to Amerigroup Illinois of $2.24 per member, per month.  A copy of an October

27, 2003, e-mail from Jennie Honosky, Senior Manager of Medical Finance at Amerigroup Corporation, setting out the cost of correcting payment of post-stabilization claims is attached hereto as Exhibit F.

64.     As of the date of Relator's termination, Amerigroup Corporation had not fully implemented the Diagnosis Related Group (DRG) payment system necessary to ensure Illinois Medicaid providers were being paid at the State rates for post-stabilization claims.

65.     In Fall 2002, HFS sanctioned Amerigroup Illinois $5,000 for failure to appropriately pay claims for emergency room and post-stabilization services at out-of-network hospitals.

66.     As of early December 2002, the previously-described problems regarding emergency claim payments had not been resolved.  Ted Wille, Director of Operations at Amerigroup Corporation, was  fully aware that the problems regarding emergency claim payments had not been resolved.  Nonetheless, during a telephone conference call at that time, Wille directed Moise to inform the State of Illinois that the emergency room payment problems had been corrected.

67.     Also in December, 2002, Moise sent a letter to HFS falsely stating that Amerigroup Illinois had, effective immediately, corrected the payment problems with the emergency room claims.  Exhibit K.  The false information was sent to the State with complete knowledge by Moise, other Amerigroup Illinois senior management, and Amerigroup Corporation that Amerigroup Illinois' claim payment failings had not been resolved and the information being sent to HFS was in fact false.

68.     HFS raised the previously-described emergency room and post-stabilization claim payment issue again with Amerigroup Illinois at its first quarterly operations meeting in 2003.  At that meeting, Moise assured HFS orally that the problems had been corrected. Moise made this statement to the State when he was fully aware that the emergency room and post-stabilization claims issues were not resolved.

69.     As a result of monthly operational review meetings between Amerigroup Illinois and Amerigroup Corporation during which emergency and the post-stabilization claim payment issues were discussed, all senior management members of both Amerigroup Corporation and Amerigroup Illinois were well aware that no movement was being made on resolving the emergency room or post stabilization claims issues.

### B. THE DEFENDANTS VIOLATED THE FALSE CLAIMS ACT IN CONNECTION WITH EMERGENCY OUT-OF-NETWORK CLAIMS

70.     The Contract required Amerigroup Illinois to base its level of emergency room payment on the symptoms and condition of the beneficiary at the time of the initial examination in the emergency room. Exhibit B, § 5.1(h)(5).

71.     When Relator began at Amerigroup Illinois, she was made aware that Amerigroup Corporation had configured its claim payment system to process emergency room claims for payment based upon an internal listing of diagnosis codes which Amerigroup Corporation felt constituted a "true emergency" rather than pursuant to federal regulations and Amerigroup Illinois' Contract.

72.     Amerigroup Illinois Medical Director Prentiss Taylor developed a list of codes to identify situations Amerigroup Corporation and Amerigroup Illinois would treat for reimbursement purposes as emergencies.  Based upon this internal diagnosis listing, Amerigroup Corporation automatically denied any claim where the final diagnosis of the

patient did not meet its internally outlined severity level.  Amerigroup Corporation and Amerigroup Illinois medical review personnel were similarly trained to systematically manually deny payment of emergency room claims on appeal when the diagnosis was not contained on the qualified listing.

73.     Amerigroup Corporation's internal legal department repeatedly told upper level management that this practice was in violation of state regulations.  The practice ceased in the automatic claims processing system in late 2002.

74.     Further, while the automated claims processing system was altered to stop the practice in late 2002, throughout the remainder of Relator's employment with Amerigroup Illinois, Prentiss Taylor, Amerigroup Illinois' Medical Director, continued to manually deny claims pended for medical review as not being "true emergency" claims under Amerigroup Corporation's qualified diagnosis guidelines.

75.     The amount of emergency room claims increased dramatically in 2004, and when Relator left Amerigroup Illinois in September, 2004, Amerigroup Corporation was once again considering implementing, in automated fashion, a list of emergency room qualifiers.

**C. THE DEFENDANTS VIOLATED THE FALSE CLAIMS ACT IN CONNECTION WITH SUSPENSION OF EMERGENCY ROOM CLAIMS AND BEHAVIORAL HEALTH CLAIMS**

76.     In addition to the earlier-described payment issues with emergency room claims, Amerigroup Corporation would pend the majority of emergency room claims for Amerigroup Illinois beneficiaries for medical review.

77.     The process of pending a claim removes it from the group of claims required by federal regulation to be processed within 30 days.

78.     After a claim was pended for review, Amerigroup Corporation would request medical records from hospitals to support the claim.  The claim would be pended in Amerigroup Corporation's claim system indefinitely until the medical records were received or the time limits for submitting a claim for the services expired.

79.     Behavioral health services claims were pended for medical review by Amerigroup Corporation in the same manner.  As of September, 2004, when Relator left Amerigroup Illinois, 91% of all behavior health claims in Amerigroup Corporation's processing system were pended for medical review.

**D. THE DEFENDANTS VIOLATED THE FALSE CLAIMS ACT IN CONNECTION WITH PROVIDER INQUIRIES, COMPLAINTS AND APPEALS**

80.     In addition to centralized claims processing, Amerigroup Corporation provides centralized customer service and payment dispute resolution services for all its subsidiary companies at its corporate headquarters in Virginia Beach, Virginia.

81.     Most beneficiary inquiries and provider claim payment appeals and complaints relating to Amerigroup Illinois are received by Amerigroup Corporation's corporate offices on behalf of Amerigroup Illinois.

82.     All Amerigroup Corporation subsidiary plans have computer access to claims, appeals, complaints, beneficiary information, and other data pertinent to their respective plans.  The provider complaints and inquiries were maintained in an Amerigroup Corporation computer file known to Amerigroup Corporation and Amerigroup Illinois employees as the "Phone Log."  The appeals were maintained in an Amerigroup Corporation computer file known as the "Appeals Database."

83. Relator was not informed of the existence of the Phone Log when she began with Amerigroup Illinois. Shortly thereafter, Karen Heffinger, an employee of Amerigroup Corporation, notified Relator that Amerigroup Illinois had a backlog in Amerigroup Corporation's Phone Log system. At that point, the oldest backlogged Phone Log for Amerigroup Illinois was 1043 days. Immediately upon notification of the backlog, Relator and her staff began working through the Amerigroup Illinois Phone Logs to resolve the issues.

84. If a provider inquiry, claim payment appeal or complaint was received by any other section of either Amerigroup Corporation or Amerigroup Illinois, the employee taking the information was required to input the information into the Amerigroup Corporation system for proper handling.

85. During the course of Relator's employment with Amerigroup Illinois, she discovered that neither the Amerigroup Corporation centralized customer service unit nor other departments receiving provider inquiries or complaints were entering all such contacts into the Phone Log system. Consequently, neither Amerigroup Illinois nor Amerigroup Corporation was tracking all provider inquiries and complaints or resolving all such issues.

86. Claim appeals for Amerigroup Illinois providers were worked by both Amerigroup Corporation and Amerigroup Illinois personnel. General payment appeals were handled by Amerigroup Corporation's Centralized Appeals Team. Appeals regarding medical decisions were handled by Amerigroup Illinois' Medical Management Department. Appeals regarding payment liability of an Independent Physician

21

Association or a Physician Hospital Organization were handled by Amerigroup Illinois'

Provider Relations Department.

87.     When Relator began employment with Amerigroup Illinois, she

encountered a waist high stack of paper sitting in the floor of her new office.  Relator

looked through the stack and determined it consisted of provider appeals that had not

been processed in any manner.   Some appeals in the stack were over two years old.

Leonard Van Slyke, the sole existing employee in the Amerigroup Illinois' Provider

Relations Department, informed Relator that the stack of appeals had never been made

known to him by Relator's predecessor.

88.     Relator had one person on her staff solely devoted to accessing

Amerigroup Illinois provider appeals via Amerigroup Corporation's computer system

and resolving them on a timely basis.  In early 2004, this staff member informed Relator

that there had been no provider appeals for Amerigroup Illinois included in Amerigroup

Corporation's Appeals Database for several weeks.  Relator contacted Jeff Lewis,

Associate Vice President of Amerigroup Corporation, and was told that Amerigroup

Corporation was handling Amerigroup Illinois provider appeals as normal.

89.     Shortly thereafter, Relator's staff began receiving calls from providers

inquiring of the status of appeals they had submitted.  Relator's staff, however, could not

find record of these appeals in Amerigroup Corporation's appeals database. Relator again

contacted Lewis and was told that Jim Carlson, Head of Operations at Amerigroup

Corporation, had directed the Centralized Appeals Team to work exclusively on appeals

for Amerigroup Corporation's Texas Medicaid plans because claims processing problems

for that plan was resulting in an extremely large amount of appeals and Amerigroup

Corporation had to insure the matters were resolved promptly as it was attempting to renegotiate its contract with Texas Medicaid.

90.     As a result of this directive from Carlson, appeals for Amerigroup Illinois were backlogged for more than six months.

91.     When Amerigroup Corporation began to allow its Centralized Appeals Team to work on appeals for plans other than Texas, Amerigroup Corporation began disseminating daily appeals status reports to its subsidiary plans.  The status reports received by Relator, however, only tracked Amerigroup Illinois appeals that had been logged into Amerigroup Corporation's system.  No indication was given as to how many Amerigroup Illinois appeals Amerigroup Corporation had yet to log into the system. Relator was told by Cathy Lester, Head of Appeals at Amerigroup Corporation, that Amerigroup Illinois appeals received by Amerigroup Corporation but not yet logged into the Appeals Database were not tracked in any manner by Amerigroup Corporation. Lester also informed Relator that the receipt date utilized on the Amerigroup Illinois appeals was the date each was logged into the system rather than the date each was actually received by Amerigroup Corporation.

### E. THE DEFENDANTS MADE FALSE CLAIMS IN CONNECTION WITH OUT-OF-NETWORK BABY DELIVERY CLAIMS

92.     The Contract obligates Amerigroup to pay any out-of-network claims arising from "unexpected hospitalization due to complications of pregnancy." See Exhibit B, § 5.1(h)(4).  Amerigroup Illinois is not responsible for payment of routine delivery expenses at an out-of-network hospital if the expectant mother is out of Amerigroup Illinois' service area against medical advice except in situations where the expectant mother is out of the service area due to circumstances beyond her

control.  Amerigroup Illinois has the responsibility to educate the expectant mother of the importance of staying near her primary physician during the last month of her pregnancy.

93.    Many emergency room facilities will immediately send an expectant mother to delivery rather than examining her in the emergency room. Consequently, no emergency room services are charged to the mother and no claim for emergency services is submitted with the delivery charges. Amerigroup has no mechanism in place to differentiate emergency deliveries from normal term deliveries. Consequently, Amerigroup denies all out-of-network baby deliveries as unauthorized in-patient services.

94.    HFS repeatedly instructed Amerigroup Illinois to pay emergency delivery claims. Amerigroup Illinois employees, however, were specifically instructed by Jean Moise to ignore the directive. In fact, in the March, 2004, meeting regarding payment of claims with Ingalls Medical Center, HFS again told Amerigroup Illinois that it needed to be able to identify emergency delivery coding and pay the claims accordingly. Neither Amerigroup Corporation nor Amerigroup Illinois has taken any steps necessary to properly identify and pay these claims.

**F. THE DEFENDANTS MADE FALSE CLAIMS IN CONNECTION WITH PAYMENT OF CLAIMS PENDING SUPPLEMENTAL SECURITY INCOME DETERMINATIONS**

95.    Prior to August 1, 2003, Supplemental Security Income ("SSI") recipients were provided medical coverage directly by the State and were not to be included in managed care programs. Amerigroup Illinois' contract provides that a beneficiary's Medicaid coverage terminates when Amerigroup Illinois notifies

HFS that the beneficiary has been deemed eligible for Social Security disability benefits (SSI). See Exhibit B, § 4.4(a)(7). "Termination of coverage shall take effect at 11:59 p.m. on the last day of the month prior to the month in which SSI eligibility begins." Id.

96.     A beneficiary's SSI qualification normally took several months. Amerigroup Corporation would suspend all claims for a beneficiary who had a SSI determination pending. No payments would be made on that beneficiary's behalf during the determination period.

97.     If the beneficiary was approved for SSI benefits, Amerigroup Corporation would deny all claims pending for the beneficiary and instruct the provider to bill HFS for the services.

### G. DEFENDANTS MADE FALSE CLAIMS IN CONNECTION WITH THEIR FAILURE TO PROVIDE TRANSPORTATION SERVICES TO MEMBERS

98.     Amerigroup Illinois is required by its contract to cover transportation costs incurred to secure medical treatment. See Exhibit B, § 5.1(b). When Relator began at Amerigroup Illinois in July, 2002, Amerigroup Illinois had one network vendor for transportation services. Shortly thereafter, the vendor terminated its contract with Amerigroup Illinois based upon Amerigroup Illinois' failure to properly pay claims. Several other transportation providers were contracted with by Relator as network providers throughout the term of her employment with Amerigroup Illinois. Each of these providers has left the network as a result of Amerigroup's failure to properly pay claims.

### H. DEFENDANTS MADE FALSE CLAIMS IN CONNECTION WITH THEIR DISCRIMINATORY AND UNAUTHORIZED MARKETING PRACTICES

99.     The Contract prohibited Amerigroup from "discriminate[ing] against Eligible Enrollees on the basis of such individuals' health status or need for health services." See Exhibit B, § 3.2; See also Exhibit B, § 9.2(b). "All eligible Enrollees must be considered as potential Beneficiaries and may not be discriminated against on the basis of health status or need for health care services or on any illegal basis." See Exhibit B, § 5.3.

100.    Amerigroup Illinois instructed its marketing team to avoid persons that appeared to have the potential to file more claims than other beneficiaries. Marketing events would be held at places such as grocery stores or conferences where marketing personnel would not encounter persons with health problems.

101.    When a baby is born to an Amerigroup Illinois beneficiary and enrolled in Amerigroup Illinois' program within 45 days of the birth, Amerigroup Illinois covers the baby's medical bills from birth. Coverage for all other infants is paid from the date of enrollment. See Exhibit B, § 4.1(f). Consequently, Amerigroup Illinois marketing personnel were instructed to avoid pregnant women as potential enrollees. Relator was personally told by Jean Moise not to enter into a network provider contract with Children's Memorial Hospital so Amerigroup Illinois could avoid numerous claims for sick babies.

102.    In August, 2003, Amerigroup Illinois entered into a new contract with the State whereby the monthly premium for members ages 0 through 4 months increased to $1,244.64 per month. As a result, Amerigroup Illinois marketing representatives were instructed to now target that age bracket for membership so Amerigroup Illinois could obtain the higher premiums.

103.     The Contract required Amerigroup Illinois to obtain pre-approval from HFS of all marketing endeavors. See Exhibit B, § 5.3 Amerigroup Illinois failed to notify HFS of its intent to offer a diaper program to members aged 0-3 months until at least May, 2004, when it presented the program to the HFS for approval with an age span of 0-6 months. Additionally, Amerigroup Illinois is specifically prohibited by Section 5.4 of its Contract from providing gifts or incentives to eligible enrollees or prospective enrollees unless the incentives meet the objectives of the Medical Assistance Program or KidCare, are related to health care, do not exceed $10, and have been approved by HFS. See Exhibit B, § 5.4.

104.     Amerigroup implemented a free diaper program in November, 2003 to increase enrollment of newborns.  Amerigroup Illinois' marketing staff contacted new mothers enrolled with Amerigroup Illinois and offer free diapers for the first four months of their baby's life if the baby was enrolled in the MCO. Some of these contacts were made at hospital immediately after birth. If an enrolled new mother called Amerigroup Illinois to either disenroll her baby or report she did not desire to enroll her baby in Amerigroup, the new mother was offered diapers for the first four months of the baby's life if the baby was enrolled. Attached hereto as Exhibit G is a February 11, 2004, e-mail from Ron Austin, Director of Medical Management, outlining the benefits of the diaper program.

105.     As a result of the diaper program, Amerigroup Illinois' enrollment in the 0-3 month old category increased dramatically. In March, 2004, Amerigroup Illinois received a $190,000 retroactive adjustment for premiums for the 0-3 month old category. Attached hereto as Exhibit H is a March 17,

2004, e-mail from Keith Wolski to the Illinois Management Team reporting the receipt of this payment.

106.     During one of Amerigroup Corporation's quarterly operations review meetings, Amerigroup Illinois reported that the newborn enrollment project, "primarily a revenue generating initiative," was on track, with total enrollment in the 0-3 month age bracket of 304. It also reported that 76 newborns had been retro-enrolled since January 1, 2004, for a premium yield gain of $294,258.24. Attached hereto as Exhibit I is a copy of the May 17 – May 18, 2004, QPR Presentation, Illinois Health Plan – 2004 Q1 Accomplishments/2004 Q2 Goals.

### First Claim For Relief
### False Claims Act, 31 U.S.C. § 3729

107.     Relator incorporates Paragraphs 1 - 106 of this First Amended Complaint (hereafter, "Allegations Applicable to All Claims").

108.     The Contract provides that Amerigroup Illinois shall properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it has a contract with the treating hospital.

109.     Amerigroup Illinois' agreement to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital was a prerequisite to its participation in the Medicaid HMO program under federal law.

110.     At the times Amerigroup Illinois' promised to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital, it knew that its practices described in the Allegations Applicable to All Claims were forbidden.

111.    At the times Amerigroup Illinois' promised to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital, it intended to continue engaging in its practices described in the Allegations Applicable to All Claims.

112.    Amerigroup Illinois would not have been awarded the Contract without its promise to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

113.    The United States could not have approved the Contract or paid any government funds to the Defendants without Amerigroup Illinois' promises to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

114.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation induced HFS to enter into the Contract.

115.    Amerigroup Illinois submitted enrollment applications which contained false implied certifications, causing the State of Illinois to submit forms CMS-37 and CMS-64, which contained express false certifications to the Federal Government – falsely certifying that Amerigroup Illinois was in compliance with its obligations to properly pay for claims for emergency and post stabilization services provided by out of network hospitals.

116.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the United States by submitting false certifications to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

117.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent certifications to induce payment of benefits by HFS to Amerigroup Illinois.

118.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain government payment.

119.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $5,000 and $25,000 each for its failure to provide payment for emergency room payments.  Exhibit B, § 9.10(h).

120.    By virtue of the acts described above, the Defendants obtained funds to be paid to providers and such funds were not paid to providers.  HFS would not have paid these funds to Amerigroup Illinois or Amerigroup Corporation if it had known Amerigroup Illinois would not properly remit funds to providers.

121.    Neither Amerigroup Illinois nor Amerigroup Corporation has notified the United States of the violations of the False Claims Act alleged herein.

122.    The United States, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for their services that would otherwise not have been allowed or would have been reduced.

123.    By reason of these payments, the United States has been damaged since at least 1997 and continues to be damaged in a substantial amount.

124.     Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, as follows:

a.  Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.  Order Defendants jointly and severally to pay three times the amount of damages the United States of America has sustained for each false claim they submitted, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

c.  Order Defendants jointly and severally to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

d.  Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. § 3730 (d)(1); and,

e.  Order such other and further relief as this Court deems just and proper.

### Second Claim For Relief
### False Claims Act, 31 U.S.C. § 3729

125.     Relator incorporates by reference the Allegations Applicable to All Claims.

126.     The Contract imposed upon Amerigroup Illinois "an affirmative duty to timely report suspected Fraud and/or Abuse in the Medical Assistance Program or KidCare by the Beneficiaries or others, suspected criminal acts by Providers or the Contractor's employees, or Fraud or misconduct of Department employees to the Public Aid Office of Inspector General."  Exhibit B, §§ 5.11(a)(6) and 5.21.

127.     To meet this duty, Amerigroup Illinois was required by its Contract to immediately notify the Office of Inspector General of any fraudulent activity discovered. Exhibit B, § 5.21.

128.     If no such fraudulent activity was discovered during any reporting quarter, Amerigroup Illinois was required by its Contract to certify to HFS that no instances of fraudulent activity were discovered during the quarter.  Exhibit B, § 5.21.

129.     Despite the fraudulent activities engaged in by Amerigroup Corporation and Amerigroup Illinois as alleged in the Allegations Applicable to All Claims and knowledge of the activities by both Amerigroup Corporation and Amerigroup Illinois officers and personnel, Amerigroup Illinois falsely certified to the State each quarter during the period of 1997 to the date of the filing of this action or thereafter that no fraudulent activity was known to Amerigroup Illinois.  Certifications through the date of the filing of this action are attached hereto as Group Exhibit J.

130.     Amerigroup Illinois further certified in Jean Moise's December 2002 letter to HFS that it had corrected the problem with payment of the emergency room claims, when at the time of the certification it knew the certification to be false.

131.     Amerigroup Illinois submitted enrollment applications which contained false implied certifications, causing the State of Illinois to submit forms CMS-37 and CMS-64, which contained express false certifications to the Federal Government – falsely certifying that Amerigroup Illinois was in compliance with its obligations to properly pay for claims for emergency and post stabilization services provided by out of network hospitals.

132.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the United States by submitting false certifications to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

133.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent certifications to induce payment of benefits by HFS to Amerigroup Illinois.

134.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain government payment.

135.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $5,000 and $25,000 each for its failure to provide payment for emergency room payments.  Exhibit B, § 9.10(h).

136.     Neither Amerigroup Illinois nor Amerigroup Corporation has notified the United States of the violations of the False Claims Act alleged herein.

137.    The United States, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for their services that would otherwise not have been allowed or would have been reduced.

138.    By reason of these payments, the United States has been damaged since at least 1997 and continues to be damaged in a substantial amount.

139.    Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

a.  Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

b.  Order Defendants jointly and severally to pay three times the amount of damages the United States of America has sustained for each false claim they submitted, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

c.  Order Defendants jointly and severally to pay Relator's reasonable costs and expenses, including attorneys' fees, pursuant to 31 U.S.C. §3730(d)(1);

d. Order that the Relator be awarded the statutory percentage of the amount received by the government pursuant to 31 U.S.C. § 3730 (d)(1); and,

e. Order such other and further relief as this Court deems just and proper.

### Third Claim For Relief
### False Claims Act, 31 U.S.C. § 3729

140.    Relator incorporates by reference the Allegations Applicable to All Claims.

141.    Payment to Amerigroup Illinois by HFS under its Contract was premised on Amerigroup Illinois' "performance of the Contractor's duties and obligations" outlined in its contract.  Exhibit B, §6.2.

142.    The Contract required Amerigroup Illinois to "[p]erform all services and other duties as set forth in th[e] Contract in accordance with, and subject to, the Administrative Rules and Departmental materials, including but not limited to, Departmental policies, Department Provider Notices, Provider Handbooks and any other rules and regulations that may be issued or promulgated from time to time during the term of th[e] Contract." Exhibit B, § 2.3.

143.    Failure of Amerigroup Illinois to perform in accordance with its Contract could result in termination of the Contract by the Department for cause or assessment of sanctions to Amerigroup Illinois.  Exhibit B, § 8.3(a), § 9.10.

144.    Amerigroup Corporation and Amerigroup Illinois concealed from HFS the fraudulent activities they engaged in as alleged in the Allegations Applicable to All

Claims in order to maintain its MCO Contract and receive payment from HFS and to avoid sanctions and/or termination of Amerigroup Illinois' Contract.

145.     Amerigroup Illinois submitted false documentation to HFS, including but not limited to Jean Moise's December 2002, letter, monthly operational reports and enrollment forms, indicating that Amerigroup Illinois was in full compliance with its Contract.

146.     By accepting payment from HFS, Amerigroup Illinois certified to HFS that it was in full compliance with its Contract.

147.     Had HFS been aware of Amerigroup Illinois' fraudulent activities, it would have terminated Amerigroup Illinois' contract and stopped Amerigroup Illinois from receiving funds to which it was not entitled or, in the alternative, levied sanctions against Amerigroup Illinois.

148.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the United States by submission of false information to HFS to result in payments to Amerigroup Illinois for Medicaid beneficiary premiums and to avoid sanctions.

149.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent documents to induce payment of benefits by HFS to Amerigroup Illinois and to avoid sanctions.

150.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain government payment.

151.     Neither Amerigroup Illinois nor Amerigroup Corporation has notified the United States Government of the violations of the False Claims Act alleged herein.

152.     The United States, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

153.     By reason of these payments, the United States has been damaged since at least 1997, and continues to be damaged in a substantial amount.

154.     Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants, and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

    a.   Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

    b.   Order Defendants jointly and severally to pay three times the amount of damages the United States of America has sustained for each false claim they submitted, plus a civil penalty of $10,000 for any false claims submitted prior to September 29, 1999, $11,000 for any false claim submitted on or after September 29, 1999, and the costs of this action pursuant to 31 U.S.C. § 3729(a);

    c.  Order Defendants jointly and severally to pay Relator's reasonable

        costs and expenses, including attorneys' fees, pursuant to 31

        U.S.C. §3730(d)(1);

    d.  Order that the Relator be awarded the statutory percentage of the

        amount received by the government pursuant to 31 U.S.C. § 3730

        (d)(1); and,

    e.  Order such other and further relief as this Court deems just and

        proper.

***Fourth Claim For Relief***
***False Claims Act, 31 U.S.C. § 3729***

155.    Relator incorporates by reference the Allegations Applicable to All

Claims.

156.    Payment to Amerigroup Illinois by HFS under its Contract was premised

on Amerigroup Illinois' "performance of the Contractor's duties and obligations"

outlined in its Contract.  Exhibit B, § 6.2.

157.    Amerigroup Illinois was required by Section 5.11 of its Contract to

submit monthly, quarterly, and annual reports to HFS to reports its performance under the

terms and conditions of its Contract.  Exhibit B, § 5.11.

158.    The information Amerigroup Illinois submitted to HFS monthly via

formal report included, but was not limited to:

    a.  The number of claims received, processed, and suspended for

        further review;

    b.  The timeliness of its claims processing activities;

    c.  The number of provider inquiries received and resolved;

     d.  The timeliness of its handling of provider inquiries;

     e.  The number of provider appeals received and resolved;

     f.  The timeliness of its handling of provider appeals.

159.    Upon information and belief, despite the fraudulent activities engaged in by Amerigroup Corporation and Amerigroup Illinois as alleged in the Allegations Applicable to All Claims and knowledge of the activities by both Amerigroup Corporation and Amerigroup Illinois officers and personnel, Amerigroup Illinois submitted fraudulent data to HFS each month from at least July, 2002 through the date its Contract terminated, falsely indicating:

     a.  The number of claims received, processed, and suspended for further review;

     b.  The timeliness of its claims processing activities;

     c.  The number of provider inquiries received and resolved;

     d.  The timeliness of its handling of provider inquiries;

     e.  The number of provider appeals received and resolved;

     f.  The timeliness of its handling of provider appeals.

160.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the United States by submitting false reports to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

161.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent reports to induce payment of benefits by HFS to Amerigroup Illinois.

162.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false reports to obtain government payment and avoid sanctions.

163.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $1,000 and $5,000 each for its failure to perform as required by its Contract.  Exhibit B, § 9.10(k).

164.    Neither Amerigroup Illinois nor Amerigroup Corporation has notified the United States of the violations of the False Claims Act alleged herein. The United States, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

165.    By reason of these payments, the United States has been damaged since at least July, 2002.

166.    Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 31 U.S.C. §3730(d)(1).

WHEREFORE, the United States of America by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants and issue orders in accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

    a.  Order Defendants to cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

    b.  Order Defendants jointly and severally to pay three times the amount of damages the United States of America has sustained for

each false claim they submitted, plus a civil penalty of $10,000 for

any false claims submitted prior to September 29, 1999, $11,000

for any false claim submitted on or after September 29, 1999, and

the costs of this action pursuant to 31 U.S.C. § 3729(a);

c.  Order Defendants jointly and severally to pay Relator's reasonable

costs and expenses, including attorneys fees, pursuant to 31 U.S.C.

§3730(d)(1);

d.  Order that the Relator be awarded the statutory percentage of the

amount received by the government pursuant to 31 U.S.C. § 3730

(d)(1); and,

e.  Order such other and further relief as this Court deems just and

proper.

### *Fifth Claim For Relief*
### *Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3-(a)*

167.    Relator incorporates by reference the Allegations Applicable to All

Claims.

168.    Amerigroup Illinois' Contract required that Amerigroup Illinois shall

properly pay for emergency services and post stabilization services for its Medicaid

beneficiaries regardless of whether it had a contract with the treating hospital.

169.    Amerigroup Illinois' agreement properly to pay for emergency services

and post stabilization services for its Medicaid beneficiaries regardless of whether it has a

contract with the treating hospital was a prerequisite to its participation in the Medicaid

HMO program under state and federal law.

170.     At the times Amerigroup Illinois' promised properly to pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it has a contract with the treating hospital, it knew that its practices described in the Allegations Applicable to All Claims were forbidden.

171.     At the times Amerigroup Illinois' promised to properly pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital, it intended to continue engaging in its practices described in the Allegations Applicable to All Claims.

172.     Amerigroup Illinois would not have been awarded the Contract without its promise properly to pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

173.     The State of Illinois and the United States Government could not have approved the Contract without Amerigroup Illinois' promise properly to pay for emergency services and post stabilization services for its Medicaid beneficiaries regardless of whether it had a contract with the treating hospital.

174.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the State of Illinois by submitting false certifications to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

175.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent certifications to induce payment of benefits by HFS to Amerigroup Illinois.

176.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain government payment.

177.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation induced HFS to enter into the Contract.

178.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $5,000 and $25,000 each for its failure to provide payment for emergency room payments.  Exhibit B, § 9.10(h).

179.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation obtained funds to be paid to providers and such funds were not paid to providers.  HFS would not have paid these funds to Amerigroup Illinois or Amerigroup Corporation if it had known Amerigroup Illinois would not properly remit funds to providers.

180.    Neither Amerigroup Illinois nor Amerigroup Corporation has notified the State of Illinois of the violations of the False Claims Act alleged herein.

181.    The State of Illinois, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

182.    By reason of these payments, the State of Illinois has been damaged since at least 1997 and continues to be damaged in a substantial amount.

183.     Relator is entitled to reimbursement of her reasonable expenses, which
include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 31
U.S.C. §3730(d)(1).

WHEREFORE, the State of Illinois by the Relator, Colleen Batty,  prays this
Court give judgment in its favor and against the Defendants and issue orders in
accordance with the False Claims Act, 31 U.S.C. § 3729 *et seq.*, specifically as follows:

a.   Order Defendants to cease and desist from violating the Illinois
Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et
seq.*;

b.   Order Defendants to pay three times the amount of damages the
State has sustained for each false claim submitted by the
Defendants, plus a civil penalty of $10,000 for any false claims
submitted, and the costs of this action pursuant to 740 ILCS 175/3;

c.   Order Defendants to pay the Attorney General's expenses,
including reasonable attorneys' fees and costs, pursuant to 740
ILCS 175/4;

d.   Order Defendants to pay the Relator's reasonable costs and
expenses, including reasonable attorneys' fees, pursuant to 740
ILCS 175/4(d)(1);

e.   Order that Relator be awarded the statutory percentage of the
amount received by the State of Illinois pursuant to 740 ILCS
175/4(d); and,

  f. Order such other and further relief as this Court deems just and

proper.

**Sixth Claim For Relief**
**Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3-(a)**

  184. Relator incorporates by reference the Allegations Applicable to All

Claims.

  185. Amerigroup Illinois' Contract provides that Amerigroup Illinois has: "an

affirmative duty to timely report suspected Fraud and/or Abuse in the Medical Assistance

Program or KidCare by the Beneficiaries or others, suspected criminal acts by Providers

or the Contractor's employees, or Fraud or misconduct of Department employees to the

Public Aid Office of Inspector General. Exhibit B, § 5.11(a)(6), § 5.21.

  186. To meet this duty, Amerigroup Illinois was required by its Contract to

immediately notify the Office of Inspector General of any fraudulent activity discovered.

Exhibit B, § 5.21.

  187. If no such fraudulent activity was discovered during any reporting

quarter, Amerigroup Illinois was required by its Contract to certify to HFS that no

instances of fraudulent activity were discovered during the quarter.  Exhibit B, § 5.21.

  188. Despite the fraudulent activities engaged in by Amerigroup Corporation

and Amerigroup Illinois as alleged in Allegations Applicable to All Claims and

knowledge of the activities by both Amerigroup Corporation and Amerigroup Illinois

officers and personnel, Amerigroup Illinois has falsely certified to the State each quarter

during the period of 1997 to the present that no fraudulent activity was known to

Amerigroup Illinois.

  189. Said certifications are attached hereto as Group Exhibit J.

190.     Amerigroup Illinois further certified in Jean Moise's December 2002 letter to HFS that it had corrected the problem with payment of the emergency room claims, when at the time of the certification it knew the certification to be false.

191.     Amerigroup Illinois submitted enrollment applications which contained false implied certifications, causing the State of Illinois to submit forms CMS-37 and CMS-64, which contained express false certifications to the Federal Government – falsely certifying that Amerigroup Illinois was in compliance with its obligations properly to cover and pay for claims for emergency and post stabilization services provided by out of network hospitals.

192.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the State of Illinois by submitting false certifications to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

193.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent certifications to induce payment of benefits by HFS to Amerigroup Illinois.

194.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain state payment.

195.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $5,000 and $25,000 each for their failure to provide payment for emergency room payments.  Exhibit B, § 9.10(h).

196.    Neither Amerigroup Illinois nor Amerigroup Corporation has notified the State of Illinois of the violations of the Illinois Whistleblower Reward and Protection Act alleged herein.

197.    The State of Illinois, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

198.    By reason of these payments, the State of Illinois has been damaged since at least 1997 and continues to be damaged in a substantial amount.

199.    Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants, and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, specifically as follows:

      a.  Order Defendants to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*;

      b.  Order Defendants to pay three times the amount of damages the State has sustained for each false claim submitted by the defendants, plus a civil penalty of $10,000 for any false claims submitted, and the costs of this action pursuant to 740 ILCS 175/3;

c.   Order Defendants to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

d.   Order Defendants to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

e.   Order that Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

f.   Order such other and further relief as this Court deems just and proper.

*Seventh Claim For Relief*
*Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3-(a)*

200.   Relator incorporates by reference the Allegations Applicable to All Claims.

201.   Payment to Amerigroup Illinois by HFS under its Contract was premised on Amerigroup Illinois' "performance of the Contractor's duties and obligations" outlined in its Contract.  Exhibit B, § 6.2.

202.   The Contract required Amerigroup Illinois to: "[p]erform all services and other duties as set forth in th[e] Contract in accordance with, and subject to, the Administrative Rules and Departmental materials, including but not limited to, Departmental policies, Department Provider Notices, Provider Handbooks and any other rules and regulations that may be issued or promulgated from time to time during the term of th[e] Contract." Exhibit B, § 2.3.

48

203.     Failure of Amerigroup Illinois to perform in accordance with its Contract could result in termination of the Contract by the Department for cause or assessment of sanctions to Amerigroup Illinois.  Exhibit B, § 8.3(a), §9.10.

204.     Amerigroup Corporation and Amerigroup Illinois concealed from HFS the fraudulent activities engaged in by them as alleged in the Allegations Applicable to All Claims in order to maintain the Contract and receive payment from HFS and avoid sanctions and termination of its Contract.

205.     Amerigroup Illinois submitted false documentation to HFS, including but not limited to Jean Moise's December 2002 letter and monthly operational reports, indicating that Amerigroup Illinois was in full compliance with its Contract.

206.     By accepting payment from HFS, Amerigroup Illinois certified to HFS that it was in full compliance with its contract.

207.     Had HFS been aware of Amerigroup Illinois' fraudulent activities, it could have terminated the Contract and stopped Amerigroup Illinois from receiving funds to which it was not entitled or in the alternative, levied sanctions against Amerigroup Illinois.

208.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the State of Illinois by submission of false information to HFS to result in payments to Amerigroup Illinois for Medicaid beneficiary premiums and to avoid sanctions.

209.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or

fraudulent documents to induce payment of benefits by HFS to Amerigroup Illinois and to avoid sanctions.

210.    By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false statements to obtain state payment.

211.    Neither Amerigroup Illinois or Amerigroup Corporation has notified the State of Illinois of the violations of the False Claims Act alleged herein.

212.    The State of Illinois, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

213.    By reason of these payments, the State of Illinois has been damaged since at least 1997, and continues to be damaged in a substantial amount.

214.    Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants, and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, specifically as follows:

> a.   Order Defendants to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*;

b.  Order Defendants to pay three times the amount of damages the State has sustained for each false claim submitted by the defendants, plus a civil penalty of $10,000 for any false claims submitted, and the costs of this action pursuant to 740 ILCS 175/3;

c.  Order Defendants to pay the Attorney General's expenses, including reasonable attorneys' fees and costs, pursuant to 740 ILCS 175/4;

d.  Order Defendants to pay the Relator's reasonable costs and expenses, including reasonable attorneys' fees, pursuant to 740 ILCS 175/4(d)(1);

e.  Order that Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

f.  Order such other and further relief as this Court deems just and proper.

### Eighth Claim For Relief
### Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/3-(a)

215.    Relator incorporates by reference the Allegations Applicable to All Claims.

216.    Payment to Amerigroup Illinois by HFS under its Contract was premised on Amerigroup Illinois' "performance of the Contractor's duties and obligations" outlined in the Contract.  Exhibit B, § 6.2.

217.     Section 5.11 of the Contract required Amerigroup Illinois by to submit monthly, quarterly, and annual reports to HFS to report its performance under the terms and conditions of its Contract.  Exhibit B, § 5.11.

218.     Upon information and belief, the information Amerigroup Illinois submitted to HFS monthly via formal report included, but was not limited, to:

>   a.  The number of claims received, processed, and suspended for further review;
>
>   b.  The timeliness of its claims processing activities;
>
>   c.  The number of provider inquiries received and resolved;
>
>   d.  The timeliness of its handling of provider inquiries;
>
>   e.  The number of provider appeals received and resolved;
>
>   f.  The timeliness of its handling of provider appeals.

219.     Upon information and belief, despite the fraudulent activities engaged in by Amerigroup Corporation and Amerigroup Illinois as alleged in the Allegations Applicable to All Claims and knowledge of the activities by both Amerigroup Corporation and Amerigroup Illinois officers and personnel, Amerigroup Illinois submitted fraudulent data to HFS each month from at least July, 2002 falsely indicating:

>   a.  The number of claims received, processed, and suspended for further review;
>
>   b.  The timeliness of its claims processing activities;
>
>   c.  The number of provider inquiries received and resolved;
>
>   d.  The timeliness of its handling of provider inquiries;
>
>   e.  The number of provider appeals received and resolved;

      f.   The timeliness of its handling of provider appeals.

220.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation defrauded the State of Illinois by submitting false reports to HFS which resulted in payments to Amerigroup Illinois for Medicaid beneficiary premiums.

221.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly submitted or caused to be submitted false or fraudulent reports to induce payment of benefits by HFS to Amerigroup Illinois.

222.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation knowingly made, used or caused to be made or used false reports to obtain government payment and avoid sanctions.

223.     By virtue of the acts described above, Amerigroup Illinois and Amerigroup Corporation avoided numerous sanctions of between $1,000 and $5,000 each for its failure to perform as required by its Contract.  Exhibit B, §9.10(k).

224.     Neither Amerigroup Illinois or Amerigroup Corporation has notified the State of Illinois of the violations of the False Claims Act alleged herein.

225.     The State of Illinois, unaware of the falsity of the records and statements made or caused to be made by Amerigroup Illinois and Amerigroup Corporation, paid funds to  Amerigroup Illinois for its services that would otherwise not have been allowed or would have been reduced.

226.     By reason of these payments, the State of Illinois has been damaged since at least July, 2002.

227.     Relator is entitled to reimbursement of her reasonable expenses, which include her attorneys' fees and costs, incurred in maintaining this action, pursuant to 740 ILCS 175/4(d)(1).

WHEREFORE, the State of Illinois by the Relator, Colleen Batty, prays this Court give judgment in its favor and against the Defendants, and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, specifically as follows:

a. Order Defendants to cease and desist from violating the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*;

b. Order Defendants to pay a compensatory amount equal to three times the amount of damages the State has sustained for each false claim submitted by the defendants, plus a civil penalty of $10,000 for any false claims submitted, and the costs of this action pursuant to 740 ILCS 175/3;

c. Order Defendants to pay the Attorney General's expenses, including reasonable attorneys fees and costs, pursuant to 740 ILCS 175/4;

d. Order Defendants to pay the Relator's reasonable costs and expenses, including reasonable attorney's fees, pursuant to 740 ILCS 175/4(d)(1);

e.   Order that Relator be awarded the statutory percentage of the amount received by the State of Illinois pursuant to 740 ILCS 175/4(d); and,

f.   Order such other and further relief as this Court deems just and proper.

### Ninth Claim For Relief
### False Claims Act 31 U.S.C. § 3730(h)
### (Wrongful Discharge and Employment Actions)

228.    This is a claim for relief  arising from the illegal discharge and other employment actions of Batty by Amerigroup Illinois in violation of the False Claims Act, 31 U.S.C. § 2739, *et seq.*, as amended (hereafter "FCA").

229.    Amerigroup Illinois, in conjunction with Amerigroup Corporation and pursuant to its consent, acquiescence or directive, discharged, threatened, harassed, and otherwise discriminated against Batty in the terms and conditions her employment because of her lawful acts in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section and for opposing Defendants' fraudulent and false billing practices.

230.    At all relevant times, defendant Amerigroup Corporation was in fact responsible for and assumed responsibility and control for the acts and omissions of Amerigroup Illinois, including the discharge of Batty from employment.

231.    In February 2002, Amerigroup Illinois was sanctioned $5,000 by HFS for failure to appropriately pay claims for emergency room and post-stabilization services at out-of-network hospitals.   From the date of her employment in July 2002 (subsequent to the sanction date), and continually until her termination, Relator advised her superiors

orally and in writing, including Moise, Rosenthal and Amerigroup, that Defendants were not, but must in fact, bring Defendant into compliance with the settlement agreement and Medicaid contracts.

232.     In the fall of 2003, Relator personally sent numerous e-mails to Kent Monical, Vice President of Medical Finance, Edie Moore, Vice President of Claims, and Karen Carnes, Associate Vice President of Medical Finance, reminding them that Amerigroup Illinois was not paying providers correctly on post-stabilization claims and was therefore out of compliance with its HFS contract.

233.     Between February 2002 and the date of Batty's termination in September 2004, Batty met and spoke with all senior management members of both Defendants. In those meetings, top management was told by Batty and others managers that Defendants had taken no action to resolve the post stabilization issue regardless of the indication to the State otherwise and that failure to pay these claims was unlawful.

234.     In December, 2002, Jean Moise, Amerigroup Illinois COO, sent a letter to HFS, falsely stating that Amerigroup Illinois had fixed its payment problems with the emergency room claims.  Batty informed Moise and other top management of Defendants, including Rosenthal, that the letter was false.  In fact, Defendants failure and/or refusal to pay providers for emergency room claims was not then resolved by Defendants. In addition, Defendants' failure and/or refusal to pay providers for post-stabilization claims was still on-going as of late September 2004, when Relator was terminated by Defendants.

235.     In October of 2003, Batty hired a new Provider Relations Representative, Linda Osinski.  With regard to provider appeals, Osinki's job included making

preliminary or final decisions on first, second and third level appeals and recording the information from and into the appeals database and logs.

236.     In early 2004, Osinski reported to Batty that there had been no appeals to download in several weeks. Since it was unlikely that there were not appeals, Batty contacted Associate Vice President Jeff Lewis at Amerigroup.  In turn, Lewis told Batty that Amerigroup was processing the Illinois appeals as normal, and that there must not be any new appeals in the database.  Lewis' representation was false.

237.     In May, 2004, Jean Moise was terminated by Amerigroup Corporation and was replaced by Jared Rosenthal as the CEO of Amerigroup Illinois.   Between that date and her termination in September 2004, Batty met with Rosenthal individually, and in weekly and monthly management meetings. Batty told Rosenthal repeatedly that Amerigroup failed to pay providers for post-stabilization claims, and that it had to be fixed. She told him that Defendants owed Ingalls Hospital payments for claims and the amount due. In response, Rosenthal said that Defendants would not pay the amount due.

238.     On or about June 29, 2004, Batty, CEO Rosenthal and other Amerigroup Illinois senior staff, met with HFS representatives and Ingalls Hospital.  The meeting was at the request of Ingalls, to resolve its claims that Defendants had failed to pay the hospital for post-stabilization and emergency room claims.  Prior to and after the meeting, Batty told Rosenthal that Ingalls Hospital was correct and it had been cheated out of payments for past claims. However, at the meeting with the government and Ingalls, CEO Rosenthal represented that Defendants would look into the matter and pay each claim appropriately.  Instead, as he had told Batty, Rosenthal refused to pay the

amount due, and subsequently offered a discounted amount to Ingalls. At the time of Batty's termination, the matter remained unresolved.

239.     In July, 2004, Batty sent an e-mail to Rosenthal  updating him on the activities of her department and the status of the post-stabilization claims situation, namely, that Defendants remained non-compliant.

240.     On or about September 26, 2004, Batty went to Rosenthal's office for a regularly scheduled bi-weekly meeting.  When she arrived, Rosenthal told Batty that the company was restructuring, and she was being let go effective immediately, and was escorted out of the premises.

241.     Prior to the termination of her employment, Plaintiff received performance reviews with top ratings.

242.     Batty's communications to Defendants' top management, in insisting that errors in payment be corrected, her refusal to ignore or to permit defendants to ignore such violations and refusal to acquiesce in violations of state and federal laws, including the Illinois Whistleblower Reward and Protection Act, constitute protected activities.

243.     Batty's protected activity was a motivating factor in Defendants' discharge of her employment.

244.     Section 3730(h) of the FCA states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.  Such relief shall include reinstatement with the

same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

245.   As a direct and proximate cause of the foregoing, Batty has lost, and will continue to lose, income and benefits and has suffered intangible losses, including mental anguish, embarrassment, inconvenience, and losses to her reputation.

WHEREFORE, the Plaintiff, Colleen Batty, prays this Court give judgment in her favor against Amerigroup Illinois, and issue orders in accordance with the False Claims Act, 31 U.S.C. Sec. 3730 (h), *et seq.*, specifically that:

    a.   Amerigroup Illinois reinstate Batty with the same seniority status such employee would have had but for the discrimination and at same rate of pay with normal pay increases from the date of discharge to the date of reinstatement;

    b.   Amerigroup Illinois pay Batty two times the amount of back pay, plus interest on the back pay, and compensation for any special damages sustained as a result of the discrimination from the date of discharge to the date of reinstatement;

    c.   Amerigroup Illinois pay Batty her costs and attorneys' fees pursuant to 31 U.S.C.  3730 (h); and

    d.   Such other and further relief as this Court deems just and proper.

***Tenth Claim For Relief***
***Illinois Whistleblower Reward and Protection Act***
***740 ILCS 175/4(g)***

246.    Plaintiff repeats and reasserts the allegations of the Ninth Claim for Relief as if fully set forth herein.

247.    740 ILCS 175/4(g) states:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate circuit court for the relief provided in this subsection (g).

248.    Batty's communications to Defendants' top management, in insisting that errors in payment be corrected, her refusal to ignore or to permit defendants to ignore such violations and refusal to acquiesce in violations of state and federal laws, including the Illinois Whistleblower Reward and Protection Act, constitute protected activities.

249.    As a direct and proximate cause of the foregoing, Batty has lost, and will continue to lose, income and benefits and has suffered intangible losses, including mental anguish, embarrassment, inconvenience and losses to her reputation.

250.    Batty's protected activity was a motivating factor in Defendants' discharge of her employment.

251.    Subsequent to her termination, in 2005 Batty found comparable employment.

WHEREFORE, the Plaintiff, Colleen Batty, prays this Court give judgment in her favor against Amerigroup Illinois, and issue orders in accordance with the Illinois Whistleblower Reward and Protection Act, 740 ILCS 175/1, *et seq.*, specifically that:

a.  Amerigroup Illinois reinstate Batty with the same seniority status such employee would have had but for the discrimination and at same rate of pay with normal pay increases from the date of discharge to the date of reinstatement;

b.  Amerigroup Illinois pay Batty two times the amount of back pay, plus interest on the back pay, and compensation for any special damages sustained as a result of the discrimination from the date of discharge to the date of reinstatement;

c.  Amerigroup Illinois pay Batty's costs and attorneys' fees pursuant to 740 ILCS 175/4(g); and

d.  Such other and further relief as this Court deems just and proper.

Respectfully submitted,

George A. Zelcs
GZelcs@KoreinTillery.com
Korein Tillery LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
(312) 641-9750

Stephen M. Tillery
stillery@koreintillery.com
Korein Tillery LLC
701 Market Street, Suite 300
St. Louis, Missouri 63101
Phone:  (314) 241-4844
Fax:  (314) 241-3525

Robin Potter

robinpotter@igc.org
Robin Potter & Associates, P.C.
111 E. Wacker – Suite 2600
Chicago, IL 60601
(312) 861-1800


By:  /s/  John Bruegger
Kenneth J. Brennan
kbrennan@simmonscooper.com
John Bruegger
jbruegger@simmonscooper.com
SimmonsCooper LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-2222

Attorneys for Relator Colleen A. Batty

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2007, a copy of the foregoing First Amended Complaint was filed electronically.  Notice of this filing will be sent by e-mail to all counsel of record by operation of the Court's electronic filing system.  Parties and counsel may access this filing through the Court's CM/ECF system.

By: /s/ John Bruegger
Kenneth J. Brennan
kbrennan@simmonscooper.com
John Bruegger
jbruegger@simmonscooper.com
SimmonsCooper LLC
707 Berkshire Blvd.
East Alton, Illinois 62024
(618) 259-2222


Attorneys for Relator Colleen A. Batty