CH

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. COLLEEN BATTY, et al., ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 05 C 1416 |
| AMERIGROUP ILLINOIS, INC., and AMERIGROUP CORPORATION, ) ) ) ) | Judge Ruben Castillo |
| Defendants, ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Colleen Batty ("Plaintiff"), filed this *qui tam* action under the False Claims Act

("FCA"), 31 U.S.C. § 3729, *et seq.,* and the Illinois Whistleblower Reward and Protection Act

("IWRPA"), 740 ILCS 175/1, *et seq.*, alleging fraud by Amerigroup Illinois and its parent

company, Amerigroup Corporation (collectively "Defendants"), in connection with their

operation of a health maintenance organization ("HMO") for Medicaid recipients in Illinois. (R.

54, Am. Compl.) She seeks damages and civil penalties on behalf of the United States and the

State of Illinois. (*Id.* ¶¶ 2-3.) She further alleges that Defendants discharged her in violation of

the FCA and IWRPA because of her opposition to their fraudulent practices, and seeks damages

in connection with her discharge. (*Id.* ¶¶ 4, 228-251.)

Presently before the Court is Defendants' motion to dismiss Plaintiff's First Amended

Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (R. 68, Mot. to

Dismiss.) Defendants argue that Counts 1 through 8, the *qui tam* claims, must be dismissed for

lack of jurisdiction because they are duplicative of an earlier filed *qui tam* action, *U.S. ex rel.*

1

*Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007), which proceeded to trial before Judge Leinenweber and resulted in a $334 million judgment against Defendants. (R. 68, Mot. to Dismiss ¶¶ 1-2.) Defendants further argue that Counts 9 and 10, the retaliatory discharge claims, must be dismissed for failure to state a claim because Plaintiff has not adequately alleged that she was engaged in protected activity within the meaning of the FCA and IWRPA. (*Id.* ¶¶ 3-4.) For the following reasons, Defendants' motion to dismiss is granted.

## RELEVANT FACTS[1]

Medicaid is a federal and state general assistance program that provides medical benefits to low-income and other needy individuals. (R. 54, Am. Compl. ¶ 14.) At the federal level, the United States Centers for Medicare and Medicaid Services ("CMS") administers the Medicaid program. (*Id.* ¶ 15.) Within a broad legal framework, each state designs and administers its own Medicaid program, with funding shared between the federal government and the state. (*Id.* ¶¶ 16-17.) CMS allows states to administer Medicaid benefits through fee-for-service programs, in which the state pays claims based upon a fee schedule established by the state, or through managed care plans, in which private insurance companies contract with the state to provide medical benefits to Medicaid recipients in exchange for a set monthly per-member premium. (*Id.* ¶ 18.) Under a fee-for-service program, Medicaid beneficiaries have the right to receive medical treatment from any physician of their choosing who participates in the state's Medicaid program.

---

[1] These facts are taken from Plaintiff's complaint. In deciding a motion to dismiss under either Rule 12(b)(1) or Rule 12(b)(6), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007); *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007).

(*Id.* ¶ 19.) Under a managed care program, Medicaid beneficiaries are required to use a network of certain providers who have agreed to accept a payment lower than the customary Medicaid payment rate in exchange for referrals of Medicaid beneficiaries to their facilities. (*Id.*)

A managed care organization ("MCO") contracting with a state to administer Medicaid benefits must comply with all rules and regulations governing the Medicaid program in order to receive payment. (*Id.* ¶ 20.) Failure to comply with all of the relevant rules and regulations can result in termination of the MCO's contract. (*Id.*)

Illinois was approved by CMS for the operation of a Medicaid program for low-income and other needy individuals. (*Id.* ¶ 21.) The federal government pays Illinois for a certain portion of the Medicaid program through quarterly grants. (*Id.*) From 1998 to 2006, the percentage of federal funds involved in the Illinois Medicaid program has been between 50 and 53 percent. (*Id.*) The Illinois Department of Healthcare and Family Services ("HFS"), formerly known as the Illinois Department of Public Aid,[2] is responsible for administering the Medicaid program in Illinois. (*Id.* ¶ 22.) Medicaid beneficiaries in Illinois have the option of receiving Medicaid benefits through either a fee-for-service programs or an MCO. (*Id.*) Under a fee-for-service program, HFS directly pays the treating physician. (*Id.* ¶ 25.) Under a managed care plan, HFS pays the MCO a fixed monthly payment for each individual enrolled in the program. (*Id.*) These payments are called capitation payments. (*Id.*) Managed care programs are offered for Medicaid recipients in Cook, Franklin, Jackson, Madison, Perry, Randolph, St. Clair, Washington, and Williamson Counties through MCO contracts with five different insurance

---

[2] For the sake of clarity, the Court refers to the department as HFS throughout this opinion, even though during some of the relevant events the department was called the Illinois Department of Public Aid.

3

companies. (*Id.* ¶ 24.) As of January 2005, approximately 175,000 Illinois Medicaid recipients were enrolled in a managed care program. (*Id.*)

To receive federal Medicaid grants, Illinois submits a quarterly estimate to the United States for estimated costs of operating the program, including an estimate for MCO services. (*Id.* ¶ 26.) The quarterly estimate is submitted on Form CMS 37, which includes a certification that "budget estimates only include expenditures . . . that are allowable in accordance with the applicable federal, state, and local statutes, regulations, policies, and the state plan approved by the Secretary and in effect during the fiscal year under Title XIX of the Act for the Medicaid Program." (*Id.*) The United States uses the estimate in the form to make grant awards for that quarter. (*Id.* ¶ 27.) The award authorizes the state to draw federal funds as needed through a line of credit. (*Id.*) At the end of each quarter, HFS submits its quarterly expenditure report on Form CMS 64, which details HFS's actual expenditures, and includes the same certification contained in Form CMS 37. (*Id.* ¶ 28.) The capitation payments to MCO's are included in this form. (*Id.*)

MCO's are required to reimburse medical claims in accordance with their contracts, the Illinois Public Aid Code, the Illinois Administrative Code, the rules and regulations promulgated by HFS, and all applicable federal regulations governing the Medicaid program. (*Id.* ¶ 29.)

Defendant Amerigroup Illinois operated an HMO in Illinois until July 31, 2006. (*Id.* ¶ 5.) Its parent company, Defendant Amerigroup Corporation, is a managed care health insurance company which provides administration of healthcare benefits to Medicaid recipients. (*Id.* ¶ 6.) Defendant Amerigroup Corporation presently operates managed care plans in Florida, Maryland, New Jersey, Texas, New York, and the District of Columbia. (*Id.*)

4

From 1996 through 2005, Defendants entered into managed care contracts with HFS to provide health services through a managed care plan to Illinois Medicaid recipients. (*Id.* ¶ 35.) On March 30, 2000, Defendants entered their final Contract for Furnishing Health Services by a Health Maintenance Organization ("the Contract") with HFS to provide managed care services to Medicaid recipients in Cook County. (*Id.* ¶ 36, Ex. B.) The Contract terminated on July 31, 2006. (*Id.*) The Contract required Defendants to perform all services and duties set forth therein in accordance with all applicable state and federal rules, laws, and regulations, and also to make payments to providers for covered services on a timely basis. (*Id.* ¶ 37.)

Pursuant to the Contract, Defendants enrolled members through marketing representatives, who found potential enrollees and initiated enrollment by submitting managed care enrollment forms to HFS. (*Id.* ¶ 38.) HFS processed these forms, determined the prospective member's eligibility and then, if eligible, enrolled the member. (*Id.* ¶ 39.) HFS paid Defendants the applicable capitation rate for each enrollee. (*Id.* ¶ 40.) Under the terms of the Contract, HFS made monthly payments to Defendants based on its enrollees. (*Id.*) The rates, determined by HFS, were based on several factors, including Defendants' agreement to properly pay for services to members. (*Id.* ¶ 40.) Pursuant to the Contract, Defendants were required to submit a quarterly fraud and abuse certification reporting "all allegations of Fraud, Abuse or Misconduct of Providers, Beneficiaries or Department Employees. . . ." (*Id.* ¶ 41.)

Defendant Amerigroup Corporation centralizes claims processing for all its subsidiary companies at its corporate headquarters in Virginia Beach, Virginia. (*Id.* ¶ 43.) Claims submitted are paid through this centralized processing unit. (*Id.*) Defendant Amerigroup Corporation also provides centralized customer service and payment dispute resolution services

for all its subsidiary companies at its corporate headquarters in Virginia Beach. (*Id.* ¶ 44.)

## A.     The *Tyson* Action[3]

In August 2002, Cleveland Tyson ("Tyson") filed a *qui tam* action in the Northern

District of Illinois alleging fraud in Defendants' operation of an HMO for Medicaid recipients in

Illinois. (R. 71, Def.'s Mem. In Supp. of Mot. to Dismiss, Ex. 1, *Tyson* Compl. ¶ 3.) Pursuant to

the provisions of the FCA, the action was initially filed under seal.[4]  Tyson was Defendants'

associate vice president of government relations from June 2000 to March 2002. (*Id.*)  In his

initial complaint, which was filed *pro se*, Tyson alleged that Defendants knowingly engaged in a

pattern of fraud and abuse in that they: refused to enroll Medicaid recipients who were in

apparent need of healthcare services; fraudulently induced Medicaid recipients who were not in

apparent need of healthcare services to enroll in the HMO; disenrolled eligible Medicaid

recipients who were receiving expensive healthcare services; and unfairly limited access to care

to HMO members.  Specifically, Tyson alleged that Defendants knowingly maintained an

inadequate network of hospitals; knowingly failed to properly reimburse hospitals; knowingly

underpaid non-contracting hospitals for authorized post-stabilization services, thereby increasing

the likelihood that these hospitals would refuse to admit Defendants' members; and provided

financial incentives to contracting physician groups to limit utilization of hospital and specialty

care. (*Id.* ¶¶ 15-16, 18, 20.)  Tyson further alleged that Defendants' Virginia Beach service

---

[3] The Court takes judicial notice of the proceedings in *Tyson*. *See Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000) (in deciding Rule 12(b)(6) motion, the court is entitled to take judicial notice of matters in the public record).

[4] A *qui tam* complaint is filed *in camera* and remains under seal for at least 60 days, during which time the United States investigates and decides whether to intervene in the case. 31 U.S.C. § 3730(b)(2).  The action is not served on the defendants until the Court so orders. *Id.*

center was understaffed and under-equipped. (*Id.* ¶ 18.) Tyson alleged that the above practices were part of a scheme by Defendants to maximize profits by obtaining the highest capitation payments possible, while at the same time failing to provide eligible enrollees with the services required by the Contract. (*Id.* ¶¶ 3, 21)

In December 2002, Tyson filed a *pro se* First Amended Complaint that added claims under the IWRPA on behalf of the State of Illinois.[5] (R. 71, Def.'s Mem. in Supp. of Mot. to Dismiss, Ex. 2, *Tyson* First Am. Compl.) The conduct underlying the First Amended Complaint was substantively similar to that alleged in the original complaint. (*See id.*) The United States and the State of Illinois initially declined to intervene, and the case was unsealed and made public as of June 12, 2003. (R. 71, Def.'s Mem. in Supp. of Mot. to Dismiss, Ex. 3, *Tyson*, Docket Nos. 10, 12, and 14.)

Tyson thereafter obtained counsel, who filed a Second Amended Complaint in October 2003. (R. 71, Def.'s Mem. in Supp. of Mot. to Dismiss, Ex. 4, *Tyson* Second Am. Compl.) In the Second Amended Complaint, Tyson alleged that Defendants submitted false claims and false certifications in receiving payment under the Medicaid managed care program, specifically, that Defendants: discriminated against eligible enrollees, including pregnant women, on the basis of health status, a process known as "cherry-picking"; terminated enrollees based on the cost of providing needed medical care; failed to submit all marketing plans to HFS; engaged in marketing practices that misled, confused, or defrauded both HFS and eligible enrollees; marketed in a manner designed to discriminate; failed to notify HFS of its inappropriate

---

[5] The IWRPA is nearly identical to the FCA and allows a relator to bring a *qui tam* action to recovery damages for fraud against the State of Illinois. *See* 740 ILCS 175/4.

7

marketing activities; and made misleading and untruthful statements to eligible enrollees regarding the merits of the managed care plan. (*Id.* ¶¶ 11, 28-43.)

In March 2005, the State of Illinois was granted leave to intervene in *Tyson*. (R. 71, Def.'s Mem. In Supp. of Mot. to Dismiss, Ex. 3, *Tyson* Docket Nos. 85, 96.) In June 2005, the *Tyson* plaintiffs filed a Third Amended Complaint that added Amerigroup Corporation as a defendant, but was otherwise substantively similar to the Second Amended Complaint. (*Id.*, Ex. 6, *Tyson* Third Am. Compl.) In essence, the Third Amended Complaint alleged that Defendants submitted false or fraudulent certifications; used fraudulent representations to induce HFS to enter into contracts; failed to provide information HFS would have found critical to their decision to make payments under the contracts; and made implied certifications that they were in compliance with applicable laws. (*Id.* ¶ 3.) The Third Amended Complaint alleged that Defendants' fraud scheme involved "cherry-picking," such that they enrolled as many healthy people as possible and as few unhealthy people as possible, thereby increasing profits, despite the obligation under the Contract to enroll and serve both healthy and unhealthy Medicaid recipients. (*Id.* ¶¶ 4-5.) In October 2005, the United States was granted leave to intervene in *Tyson*. (*Id.*, Ex. 3, *Tyson* Docket Nos. 270, 353.)

In October 2006, *Tyson* proceeded to trial before Judge Leinenweber. At trial, the plaintiffs presented two theories of liability: (1) that Defendants fraudulently induced HFS to enter into contracts by promising not to discriminate based on the need for health services, even though they had no intention of keeping that promise; and (2) that Defendants submitted false claims for payment because Defendants's discriminatory enrollment practices caused them to receive inflated capitation rates. *U.S. ex rel. Tyson v. Amerigroup Ill., Inc., et al.*, 488 F. Supp.

2d 719, 723 (N.D. Ill. 2007). The jury found for the *Tyson* plaintiffs, and after extensive post-trial briefing, judgment was entered against Defendants in the amount of $334 million. (R. 71, Def.'s Mem. in Supp. of Mot. to Dismiss, Ex. 7, *Tyson* Agreed Am. Judg.) Defendants have filed an appeal of the judgment. (*Id.*, Ex. 3, *Tyson* Docket Nos. 892, 894.)

### B. Plaintiff's Case

In March 2005, roughly two years after the allegations in *Tyson* were made public, Plaintiff filed this *qui tam* action. (R. 1, Compl.) Like Tyson, Plaintiff also alleges fraud by Defendants in the operation of an HMO for Medicaid recipients in Illinois. (*Id.* ¶¶ 1, 80-156.) Plaintiff was hired in July 2002 as Defendants' associate vice president of provider relations, and was terminated in September 2004. (*Id.* ¶ 14.) She alleges that she was discharged in retaliation for her efforts to get Defendants to comply with their contractual and other legal obligations. (*Id.*) After the filing of the complaint, the Court granted numerous requests by the United States and the State of Illinois to maintain the case under seal, during which time they investigated Plaintiff's claims and considered whether to intervene.[6] (R. 5, 6, 7, 8, 10, 11, 12, 13, 14.) In December 2006, the United States and State of Illinois filed notice of their election not to intervene in Plaintiff's case. (R. 15, 18.) The case thereafter remained under seal at Plaintiff's request while she decided whether to proceed with the action; during this period Defendants remained unaware of the litigation. (R. 21, 23, 25, 27, 31.) In May 2007, the seal was lifted and the court file made public, and Plaintiff was ordered to effect service on Defendants. (R. 35.)

---

[6] This action was originally assigned to Judge Kocoras, then to Chief Judge Holderman, and was reassigned to this Court in June 2007. (R. 1, 14, 43.)

In August 2007, Plaintiff filed her First Amended Complaint. (R. 54, Am. Compl.)
Plaintiff alleges that Defendants submitted false claims and made false certifications in
connection with the following actions: failing to properly pay emergency and post-stabilization
services claims from out-of-network hospitals (R. 54, Am. Compl. ¶¶ 49-69); failing to properly
pay emergency room and behavioral health claims (Id. ¶¶ 70-79); failing to adequately process
provider inquiries, complaints, and appeals (Id. ¶¶ 80-91); failing to properly pay out-of-network
baby delivery claims (Id. ¶¶ 92-94); failing to properly handle Supplemental Security Income
("SSI") claims (Id. ¶¶ 95-97); failing to provide transportation services required by the Contract
(Id. ¶ 98); and engaging in discriminatory and unauthorized marketing practices. (Id. ¶¶ 99-
106).[7] She also alleges that Defendants received improper capitation rates because these rates
were determined based in part on Defendants' agreement to properly pay for services to
beneficiaries. (Id. ¶ 40.)

With respect to her retaliatory discharge claims, Plaintiff asserts that she was fired
because she attempted to bring Defendants into compliance with the Contract and their other
legal obligations. (Id. ¶¶ 228-251.) Specifically, she alleges that from the time she was hired in
July 2002, she continuously advised her superiors that Defendants were non-compliant with their
obligations regarding payment of out-of-network hospital claims. (Id. ¶¶ 231-239.) In
September 2004, Plaintiff was advised that Defendants were restructuring and that she was being
terminated immediately. (Id. ¶ 240.) Prior to her termination, Plaintiff received performance
reviews with top ratings. (Id. ¶ 241.) Plaintiff alleges that she was fired because of her

---

[7] Plaintiff has voluntarily dismissed Paragraphs 99-101 but has not dismissed the other
paragraphs (¶¶ 102-106) relating to Defendants' alleged discriminatory and unauthorized
marketing practices. (See R. 84, Minute Order.)

statements to superiors, her repeated insistence that the company bring itself into compliance, and her "refusal to acquiesce in violations of state and federal law." (*Id.* ¶ 242.)

Defendants have moved to dismiss Plaintiff's First Amended Complaint in its entirety. (R. 68, Defs.' Mot. to Dismiss.) First, Defendants asserts that the Court lacks jurisdiction over Plaintiff's *qui tam* claims because these claims run afoul of the "first-to-file bar" and the "government-action bar" contained in the FCA, both of which prohibit duplicative *qui tam* actions. Defendants further argues that, even assuming the Court has jurisdiction, Plaintiff's *qui tam* claims are barred by res judicata. Second, Defendants argues that Plaintiff's retaliatory discharge claims must be dismissed for failure to state a claim because she has not properly alleged that she was engaged in protected activity; that Defendants was aware she was engaged in protected activity; or that she was discharged because of protected activity covered by the FCA.

## LEGAL STANDARDS

In deciding a motion to dismiss under Rule 12(b)(1), the Court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. *St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007). The Court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.; see also U.S. ex rel. Kennedy v. Aventis Pharm., Inc.*, 512 F. Supp. 2d 1158, 1164 (N.D. Ill. 2007).

When deciding a motion to dismiss under Rule 12(b)(6), the Court assumes all well-pleaded allegations in the complaint to be true and draws all reasonable inferences in the plaintiff's favor. *Christensen v. County of Boone, Illinois*, 483 F.3d 454, 457 (7th Cir. 2007).

Detailed factual allegations are not necessary, but merely reciting the elements of a cause of action is insufficient. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (observing that the Supreme Court in *Bell Atlantic* "retooled federal pleading standards" such that a complaint must now contain "enough facts to state a claim to relief that is plausible on its face.").

To survive a motion to dismiss, a plaintiff must plead enough to "nudge[] their claims across the line from conceivable to plausible." *Bell Atlantic*, 127 S. Ct. at 1974. "The pleading must contain something more [than] a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." *Id.* at 1964-65. Under *Bell Atlantic*, "it is not enough for a complaint to avoid foreclosing possible bases for relief; it must actually suggest that the plaintiff has a right to relief." *EEOC v. Concentra Health Serv., Inc.*, 496 F.3d 773, 777 (7th Cir. 2007).

## ANALYSIS

The FCA establishes civil penalties for any person who knowingly presents or causes to be presented a false or fraudulent claim for payment by the United States.[8] 31 U.S.C. § 3729(a); *U.S. ex rel. Chandler v. Cook County, Ill.*, 277 F.3d 969, 973 (7th Cir. 2002). A person who

---

[8] The IWRPA is nearly identical to the FCA. *See* 740 ILCS 175/4. Because of the similarity in the two statutes, case law interpreting the FCA is also applicable to the IWRPA. *See Kennedy*, 512 F. Supp. 2d at 1163 n. 2; *Scachitti v. UBS Finan. Serv.*, 215 Ill.2d 484, 507 (Ill. 2005).

submits a false claim is liable for a civil penalty of between $5,000 and $10,000 for each false claim submitted, plus three times the amount of actual damages sustained by the government. 31 U.S.C. § 3729(a). An action may be brought under the FCA by either the Attorney General, 31 U.S.C. § 3730(a), or by a private individual in the government's name, 31 U.S.C. § 3730(b). The latter is known as a *qui tam* action.[9] The *qui tam* provisions of the FCA allow a private plaintiff, called a "relator," to bring suit for fraud on the government's behalf. 31 U.S.C. §§ 3730(b)(1), (c)(3), (d). A *qui tam* complaint is filed *in camera* and remains under seal for at least 60 days. 31 U.S.C. § 3730(b)(2). During this period, the relator must present all material evidence to the government, and the government investigates and decides whether to intervene and proceed with the action itself. 31 U.S.C. § 3730(b)(2); *Chandler*, 277 F.3d at 973. If the government takes over the case, the relator can receive between 15 and 25 percent of the government's recovery, depending on the extent to which the relator contributed to the prosecution of the action, plus reasonable expenses. 31 U.S.C. § 3730(d)(1). If the government declines to intervene, the relator may proceed with the action on his or her own. 31 U.S.C. § 3730(b)(4)(B). If successful, the relator can receive between 25 and 30 percent of any recovery obtained, plus reasonable expenses. 31 U.S.C. § 3730(d)(2).

To prevail in a cause of action under the FCA, the plaintiff must prove: (1) the defendant made a record or statement in order to get the government to pay money; (2) the record or statement was false or fraudulent; and (3) the defendant knew the record or statement was false or fraudulent. *U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 741 (7th Cir. 2007); *U.S.*

---

[9] *Qui tam* is short for "*qui tam pro domino rege quam pro se ipso in hac parte sequitur*," which means "who pursues this action on our Lord the King's behalf as well as his own." *Rockwell Int'l Corp. v. United States*, 127 S. Ct. 1397, 1403 n.2 (2007).

*ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999).

Because of the danger of abuse of the *qui tam* device by opportunistic individuals seeking a windfall, Congress has enacted certain provisions that limit the Court's jurisdiction over *qui tam* actions. Applicable to this case are the first-to-file bar, 31 U.S.C. § 3730(b)(5), and the government-action bar, 31 U.S.C. § 3730(e)(3). We address each in turn.

### A. The First-to-File Bar

The first-to-file bar provides: "When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action." 31 U.S.C. § 3730(b)(5).[10] In essence, the first-to-file bar precludes claims arising from events that are already the subject of an existing *qui tam* suit. *LaCorte v. Smithkline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 232 (3d Cir. 1998). The first-to-file bar was intended to reconcile two competing goals: encouraging private citizens to act as whistleblowers while at the same time preventing opportunistic suits. *LaCorte*, 149 F.3d at 233. When it was first enacted, the FCA allowed relators to file suits and receive a share of the government's recovery even if they personally did nothing to help expose the fraud. *See U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 545-48 (1943). As a result, *qui tam* litigation "surged as opportunistic private litigants chased after generous cash bounties and, unhindered by any effective restrictions under the Act, often brought parasitic lawsuits copied from preexisting indictments or based upon congressional findings." *LaCorte*, 149 F.3d at 233. In response,

---

[10] The IWRPA contains a parallel provision: "When a person brings an action under this subsection (b), no person other than the State may intervene or bring a related action based on the facts underlying the pending action." 740 ILCS 175/4(b)(5).

14

Congress in 1943 amended the FCA to prohibit such lawsuits. *Id.*

Following a decline in *qui tam* litigation, Congress again amended the FCA in 1986 with an intent to "shift the advantage back to the government" in the fight against fraud. *LaCorte*, 149 F.3d at 234. The 1986 amendments, which introduced the current version of the first-to-file bar, sought to achieve "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *U.S. ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994).

Although Section 3730(b)(5) essentially creates a "race to the courthouse" among eligible relators, it also spurs the prompt reporting of fraud. *U.S. ex rel. Stinson, et al. v. The Prudential Ins. Co.*, 944 F.2d 1149, 1176 n.5 (3d Cir. 1991); *see also U.S. v. Bank of Farmington*, 166 F.3d 853, 866 (7th Cir. 1999) (observing that FCA was intended to encourage private individuals who are aware of fraud against the government "to bring such information forward at the earliest possible time and to discourage persons with relevant information from remaining silent.").

Courts construing Section 3730(b)(5) must bear in mind the need to preserve a balance between the provision's twin purposes. *U.S. ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214, 217 (D.C. Cir. 2003); *LaCorte*, 149 F.3d at 234. Although the Seventh Circuit has not interpreted Section 3730(b)(5), other courts have observed that giving an unduly narrow interpretation to the first-to-file bar would "unnecessarily handicap[] future government efforts to recover fraudulently obtained funds." *LaCorte*, 149 F.3d at 234. Allowing every private individual with knowledge of the fraud to come forward with slightly different facts would not provide much of an incentive to the initial relators to come forward, since their

15

potential recovery would be reduced dramatically. *U.S. ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001).

Also, under a narrow interpretation of the first-to-file bar (under which subsequent cases are more likely to proceed), early-filing relators might resist government efforts to keep their suit under seal beyond the 60-day statutory period out of fear that other plaintiffs would file suit during this period, thereby reducing their share of the award. *Id.* This could pose a significant problem in cases involving complex or extensive transactions, where prolonged investigations by the government may be necessary. *Id.* Further, a narrow interpretation of the first-to-file bar would lead to more "piggyback" claims, which "do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *LaCorte*, 149 F.3d at 234; *see also Grynberg v. Koch Gateway Pipeline Co.*, 390 F.3d 1276, 1277 (10th Cir. 2004) ("Once the government is put on notice of its potential fraud claim, the purpose behind allowing qui tam litigation is satisfied."); *Lujan*, 243 F.3d at 1187 ("The first-filed claim provides the government notice of the essential facts of an alleged fraud, while the first-to-file bar stops repetitive claims.").

For these reasons, courts have held that a later *qui tam* case need not rest on precisely the same facts as a prior case to run afoul of the first-to-file bar. *LaCorte*, 149 F.3d at 233. Rather, the bar applies "so long as a subsequent complaint raises the same or a related claim based in significant measure on the core facts or general conduct relied upon in the first *qui tam* action." *Grynberg*, 390 F.3d at 1279. The second action is barred if it contains merely variations of the fraud scheme described in the first action, *Hampton*, 318 F.3d at 218-19, even if the second action alleges additional or somewhat different details about the defendant's fraud. *Grynberg*,

390 F.3d at 1280; *Lujan*, 243 F.3d at 118; *U.S. ex rel. Ortega v. Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 13 (D. D.C. 2003).

To determine whether the *Tyson* action bars Plaintiff's *qui tam* claims, the Court must compare the facts underlying the two cases. *See LaCorte*, 149 F.3d at 234-35. As an initial matter, the Court must determine which documents to consider in determining whether the cases overlap. Plaintiff appears to argue that this Court should compare her First Amended Complaint to the pretrial order entered in *Tyson* and not to any of Tyson's complaints, because the later filed document supersedes the earlier proceedings. (R. 77, Pl.'s Opp. to Mot. to Dismiss at 3-4, 6, 11, 14.)

While it may be true for general civil procedure purposes that a final pretrial order supersedes prior pleadings, *see Rockwell*, 127 S. Ct. at 1409, the Court finds no basis in the case law for concluding that under the FCA, the Court must consider only the claims that proceeded to trial in the original *qui tam* action to determine whether the first-to-file bar applies.[11] Section 3730(b)(5) refers to a related action that is based on the "facts underlying" a prior case, and does not in anyway limit the analysis to claims that proceeded to trial in the first case. *See Ortega*, 240 F. Supp. 2d at 15-16 (considering allegations contained in both original and amended

---

[11] To the extent Plaintiff is relying on *Rockwell* for the proposition that the Court must look solely to the *Tyson* pretrial order, this case is distinguishable. In *Rockwell*, the Supreme Court considered a separate jurisdictional bar requiring the relator to be the original source of the information regarding the fraud. 127 S. Ct. at 1409 (interpreting 31 U.S.C. § 3730(e)(4)). The Court concluded that it should look to the most recent pleading, in that case the pretrial order, to determine whether the relator was the original source of the claims alleged, because jurisdictional requirements must be satisfied at all stages of the litigation. *Id.*; *see also U.S. ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 735 (7th Cir. 2007) (court looks to most recent pleading to determine jurisdiction). This is a different issue than whether a *qui tam* action is barred under Section 3730(b)(5) because of an earlier-filed case.

complaint in first-filed *qui tam* action to determine whether the second *qui tam* action was barred). Moreover, Plaintiff's proposed interpretation would not further the purposes of the FCA, because "once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *Grynberg*, 390 F.3d at 1279. Here, when Tyson filed his original complaint, he was required to turn over all material information to the government related to his claims so that the government could investigate. 31 U.S.C. § 3730(b)(2); *Chandler*, 277 F.3d at 973. The allegations in *Tyson* of which the government had notice and an opportunity to investigate should be considered in determining whether Plaintiff's case is duplicative. Because a broader consideration of the facts underlying *Tyson* is necessary to effectuate the congressional purpose behind the first-to-file bar, the Court will also consider the allegations in the earlier *Tyson* complaints.

A careful comparison of the allegations contained in Plaintiff's First Amended Complaint with the facts underlying *Tyson* reveal that there is significant overlap. As Defendants point out, both actions: arise out of the same Contract; allege that Defendants knowingly submitted false claims in connection with the Contract; are based on the same certifications submitted between January 2001 and January 2003; assert that these certifications were false because Defendants failed to disclose that they were engaged in fraudulent conduct with respect to the Contract; assert that Defendants made implied certifications that they were in compliance with applicable laws and regulations; identify the same key actors; and encompass the same time frame. (*See* R. 71, Defs.' Mem. in Supp. of Mot. to Dismiss at 7-8.) Like Plaintiff, Tyson raised allegations related to Defendants' fraud in limiting access to care for members, improperly paying hospitals, engaging in discriminatory marketing practices, and failing to maintain an adequate customer

service center in Virginia Beach. (*See* R. 71, Defs.' Mem. In Supp. of Mot. to Dismiss, Ex. 1, *Tyson* Compl. ¶¶ 15-16, 18, 20; *Id.*, Ex. 2, *Tyson* Am. Compl. ¶¶ 18-19.)

Although Plaintiff adds additional details, and in some cases different nuances to her claims, these claims are based in significant measure on the core facts and general conduct relied upon in *Tyson*, and as such they are barred. *See, e.g., Hampton*, 318 F.3d at 218 (allegations in second *qui tam* action that defendants improperly billed for services that were miscoded, already paid for, performed by others, or never administered were barred by earlier *qui tam* action alleging defendants improperly billed for services that did not meet the Medicare eligibility criteria, for undocumented services, and services that were not medically necessary); *Lujan*, 243 F.3d at 1186 (second action barred where both actions involved cost-sharing transactions among and within certain defense contracts, even though details of the fraud scheme differed); *LaCorte*, 149 F.3d at 230 (broad allegations of fraud scheme in first *qui tam* action, including billing for unauthorized medical tests, barred claims in second *qui tam* action involving phony screening programs conducted at nursing homes); *Ortega*, 240 F. Supp. 2d at 17 (second *qui tam* action alleged same general fraud scheme involving kickbacks to doctors, even though details of the scheme differed).

The kind of fine distinctions Plaintiff seeks to draw between her case and *Tyson*—such as that her claims pertaining to the Virginia Beach service center involved calls from providers as opposed to calls from members—are untenable given the purposes behind the first-to-file bar. *Lujan*, 243 F.3d at 1185 ("To give credence to [plaintiff's] miscroscopically fine distinctions between her allegations and those of [the earlier action] would do injustice to the purposes underlying the False Claims Act. It is the harbinger, not the mimic, who is entitled to champion

19

the government's interests."); *Ortega*, 240 F. Supp. 2d at 12 ("[P]ermitting infinitely fine distinctions among complaints has the practical effect of dividing the bounty among more and more relators, thereby reducing the incentive to come forward with information of wrongdoing."); *see also U.S. ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 682 (D.C. Cir. 1997) ("[T]he language, structure, history and purpose of the FCA demonstrates that Congress sought to limit *qui tam* actions to those in which the relator has contributed significant independent information that is not already in the public domain.") (internal quote marks and citation omitted).

Plaintiff argues that Tyson's allegations in his original complaint regarding out-of-network hospitals and inadequacies at the Virginia Beach service center cannot serve as a bar to her claims because these claims were not sufficiently pled pursuant to Federal Rule of Civil Procedure 9(b). (R. 77, Pl.'s Opp. to Mot. to Dismiss at 16-17.) Plaintiff points out that early in the case Defendants filed a motion to dismiss the *Tyson* complaint under Rule 9(b). (*Id.*) As Defendants counter, however, the District Court denied their motion to dismiss in *Tyson*. (*See* R. 71, Defs.' Mem. In Supp. of Mot. to Dismiss, Ex. 3, *Tyson* Docket No. 21.) Thus, Plaintiff's case citations are inapposite.

For instance, in *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966 (6th Cir. 2006), the original *qui tam* complaint was so vague that it failed to give the government notice of the fraud scheme and was ultimately dismissed for failure to adequately plead fraud pursuant to Rule 9(b). Similarly, in *Campbell v. Redding Med. Ctr.*, 421 F.3d 817 (9th Cir. 2005), the court found the first-to-file bar inapplicable because the original *qui tam* action had been dismissed under Section 3730(e)(4), a related jurisdictional bar which requires the relator to be the original source

of the information regarding the fraud. *Id.* The court held that the first-to-file bar should not apply where the original *qui tam* action does not fulfill the jurisdictional prerequisites established by § 3730(e). *Id.* at 822. In such a case, the original *qui tam* action does not fulfill the purpose of the *qui tam* provisions contained in the FCA because "a pending action filed by a non-original source does not alert the government to the essential facts of a fraudulent scheme." *Id.* (citation and internal quotation marks omitted). Here, by contrast, the *Tyson* relator was an original source of the information, and the case was not dismissed on jurisdictional or any other grounds. Instead, the case proceeded to trial, and the plaintiffs obtained a $334 million judgment.

For these reasons, the Court concludes that Plaintiff's *qui tam* claims raised in Counts 1 through 8 of the First Amended Complaint are barred by Section 3730(b)(5).

### B.   The Government-Action Bar

Assuming Plaintiff could clear the hurdle of the first-to-file bar, there is a separate jurisdictional bar, known as the government-action bar, which provides: "In no event may a person bring an action under subsection (b) [the *qui tam* provisions] which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."[12] 31 U.S.C. § 3730(e)(3). This provision, also part of the 1986 amendments, was intended to prevent parasitic *qui tam* lawsuits that receive support from an earlier case without giving the government any useful return, other than the potential for additional monetary recovery. *See U.S. ex rel. S. Prawer & Co. v. Fleet*

---

[12] The IWRPA contains a parallel provision: "In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the State is already a party." 740 ILCS 175/4(e)(3).

*Bank of Maine*, 24 F.3d 320, 327-28 (1st Cir. 1994); *see also U.S. ex rel. Alexander v. Dyncorp, Inc.*, 924 F.Supp. 292, 303 (D. D.C. 1996) (finding "no useful return to the government" under Section 3730(e) where government declined to intervene in second *qui tam* action).

There is no dispute that the government was a party in *Tyson*, and for the reasons discussed above, Plaintiff's case is also based upon "allegations" or "transactions" which were the subject of *Tyson*. Both cases involve the same Contract, the same contract negotiations, the same contract provisions, the same certifications, and the same general fraud scheme by Defendants. Plaintiff argues that her First Amended Complaint "is in no sense identical to or a parasite on the Tyson action," but this misconstrues the Court's inquiry under Section 3730(e). (*See* R. 77, Pl.'s Opp. to Mot. to Dismiss at 19.) Nor does the Court find convincing Plaintiff's attempts to distinguish the two cases for the reasons explained with respect to the first-to-file bar. Accordingly, the Court concludes that Plaintiff's claims are also barred under Section 3730(e)(3).

Because the Court lacks jurisdiction over Plaintiff's *qui tam* claims pursuant to Sections 3730(b)(5) and 3730(e)(3), we do not reach Defendants's alternative argument that Plaintiff's claims are barred by res judicata.[13]

## II.    Plaintiff's Whistleblower Claims

Plaintiff also raises a retaliatory discharge claim under the whistleblower provision contained in the FCA, which provides:

---

[13] The Court also declines to consider Plaintiff's discussion of a separate jurisdictional bar contained in Section 3730(e)(4), which was not raised by Defendants in their motion to dismiss. (*See* R. 77, Pl.'s Opp. to Mot. to Dismiss at 19-21; R. 82, Defs.' Reply in Supp. of Mot. to Dismiss at 10 n. 10.)

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in terms and conditions of employment by his or her employer because of lawful acts done by the employee or on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).[14] A plaintiff may proceed with a claim for retaliatory discharge independently of a *qui tam* action. *Fanslow v. Chicago Manuf. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004); *Luckey v. Baxter Healthcare Corp.*, 2 F. Supp. 2d 1034, 1050 (N.D. Ill. 1998) ("A § 3730(h) retaliatory discharge claim can clearly still proceed even if neither governmental action is taken nor any *qui tam* action is contemplated, threatened, filed, or ultimately successful."), *aff'd*, 183 F.3d 730 (7th Cir. 1999). Thus, even though the Court is dismissing Plaintiff's *qui tam* claims for lack of jurisdiction, the Court must separately evaluate Plaintiff's retaliatory discharge claims.

To bring a retaliatory discharge claim under Section 3730(h), a plaintiff must show: (1) his actions were taken in furtherance of an FCA enforcement action; (2) the employer knew the plaintiff was engaged in this protected conduct; and (3) the discharge was motivated, at least in part, by the protected conduct. *Brandon v. Anesthesia & Pain Mgmt. Assoc., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *Luckey*, 2 F. Supp. 2d at 1050. Defendants argue that Plaintiff has not sufficiently alleged any of these elements.

Defendants first argue that Plaintiff fails to allege she engaged in conduct protected by the FCA. (R. 71, Defs.' Mem. in Supp. of Mot. to Dismiss at 20.) In the First Amended Complaint,

---

[14] The IWRPA contains a parallel retaliatory discharge provision. *See* 740 ILCS 175/4(g).

Plaintiff alleges that during her employment with Defendants, she attempted to bring Defendants into compliance with their contractual allegations. (R. 54, Am. Compl. ¶ 231-39.) She alleges that she advised her superiors that Defendants were not properly paying providers or processing their complaints. (*Id.* ¶¶ 231-34, 237, 238.) She advised her supervisors "that Defendants were not, but must in fact, bring Defendant into compliance with the settlement agreement and Medicaid contracts." (*Id.* ¶ 231.)

Although Section 3730(h) protects a broad range of conduct, the employee's conduct must be in furtherance of an action under the FCA. *Brandon*, 277 F.3d at 944; *Luckey*, 2 F. Supp. 2d at 1051. Simply making internal complaints or pointing out problems to supervisors is not sufficient. *Brandon*, 277 F.3d at 944-45 (employee who complained internally about billing practices did not engage in protected activity because he was simply trying to convince his employer to comply with Medicare billing regulations); *Luckey*, 2 F. Supp. 2d at 1052-53 (employee's activities not protected where they were directed at convincing employer to upgrade its procedures, not at exposing fraud on the government); *Kennedy*, 512 F. Supp. 2d at 1168 (employee failed to state claim under Section 3730(h) where she alleged that she had complained to her employers about off-label marketing, but did not allege that she informed employer it was defrauding the government or that she pursuing or assisting in making an FCA claim); *see also Baxter*, 183 F.3d at 733 ("Saber-rattling is not protected conduct. Only investigation, testimony, and litigation are protected. . . .").

Here, although Plaintiff ultimately brought an FCA action, she did not do so until several months after she was fired. Moreover, Plaintiff has not alleged that she was fired because she advised her supervisors that she was going to report them to the government or that she was

24

contemplating an FCA action. At most, she has alleged that she advised Defendants that they were not in compliance with their contractual obligations and sought to bring them into compliance. The Court agrees that Plaintiff has failed to allege that she was engaged in protected activity under the FCA. However, because it appears possible that Plaintiff may be able to plead additional information to establish that she was engaged in protected activity under the FCA, the Court will give her an opportunity to amend her complaint.

Defendants next argue that Plaintiff has failed to adequately allege that they knew she was engaged in protected activity when they fired her. (R. 71, Def.'s Mem. in Supp. of Mot. to Dismiss at 21.) Under this prong, Plaintiff must show that she was engaging in activities that put her employer on notice that an FCA action was a "distinct possibility." *Brandon*, 277 F.3d at 944. As stated above, this action was filed several months after Plaintiff was terminated, and at most Plaintiff alleges that she advised her superiors on several occasions that she believed Defendants were not in compliance with their contractual obligations and insisted that compliance be effectuated. (R. 54, Am. Compl. ¶¶ 231-39.) An employee's internal complaints directed at bringing the employer into compliance with its legal obligations do not put the employer on notice of potential FCA litigation. *Brandon*, 277 F.3d at 945. "An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation." *Baxter*, 183 F.3d at 733. Moreover, since Plaintiff's functions involved improving provider relations and expanding the network of providers, (*see* R. 54, Am. Compl. ¶¶ 49-50), her complaints about provider payment issues would be even less likely to put Defendants on notice that she was contemplating an FCA action. *See Brandon*, 277 F.3d at 945 (where plaintiff's job involved ensuring that billing practices complied with Medicare rules, the

25

employer would not have been put on notice of potential FCA litigation by the fact that plaintiff alerted his supervisors to concerns about billing practices).

Thus, the Court agrees that Plaintiff has failed to properly allege the second prong. Because it appears possible that Plaintiff could plead additional information as to this prong in order to properly state a claim, the Court will give her an opportunity to amend.

Finally, Defendants argue that Plaintiff has not adequately alleged that she was discharged because of her protected activity. (R. 71, Defs.' Mem. in Supp. of Mot. to Dismiss at 23.) Under this prong, Plaintiff must show that her termination was motivated "at least in part, by the protected conduct." *Brandon*, 277 F.3d at 944. Plaintiff has alleged that her FCA-related activity was a motiving factor in her discharge. (*See* R. 54, Am. Compl. ¶ 243.) Defendants argue that Plaintiff cannot possibly satisfy this prong because in a 2004 letter, she advised Defendants that she believed she had been terminated in retaliation for reporting sexual harassment. (*See* R. 71, Defs.' Mem. in Supp. of Mot. to Dismiss at 24 n. 16.) In Defendants' view, because of this letter "Plaintiff cannot amend her complaint to assert any additional facts to establish that her dismissal was motivated by her supposed protected activity under the FCA." (*Id.*) At the motion to dismiss stage, however, the Court cannot consider matters outside the complaint like the letter referenced by Defendants. *See* Fed. R. Civ. P. 12(b)(6); *Christensen*, 483 F.3d at 457. Assuming Plaintiff can overcome the deficiencies described above with respect to the first and second prongs, the Court finds no basis to prohibit her from pursuing the claim at this stage.[15] Accordingly, the Court rejects Defendants' argument that Plaintiff should not be

---

[15] This presumes, of course, that Plaintiff can allege she was discharged because of her FCA activities consistent with the requirements of Federal Rule of Civil Procedure 11.

permitted an opportunity to amend her complaint.

For these reasons, Plaintiff's retaliatory discharge claims raised in Counts 9 and 10 are dismissed without prejudice. Plaintiff is granted leave to file an amended complaint that remedies the deficiencies referenced in this opinion with respect to these two Counts.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (R. 68) is granted. Counts 1 through 8 of the First Amended Complaint (R. 54) are dismissed with prejudice. Counts 9 and 10 are dismissed without prejudice to the filing of an amended complaint on or before **February 4, 2008**, that comports with the terms of this opinion.

The parties should fully exhaust all settlement possibilities for this dispute now that the scope of this litigation has been established. Plaintiff's counsel is requested to make a written settlement demand by **January 2, 2008.** The Court will hold a settlement conference in chambers on **January 15, 2008**, at **12:00 p.m.** unless it receives notification that this matter has been settled.

ENTERED:

**Ruben Castillo**
**United States District Judge**

Dated: December 19, 2007

27